STATE of Iowa, Appellee,

v.

Larry Dean WHITE, Appellant.

No. 02–0919.

Supreme Court of Iowa.

Sept. 4, 2003.

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Laura Roan, Scott Brown, and Cristen C. Odell, Assistant Attorneys General, and Brent Symens, County Attorney, for appellee.

STREIT, Justice.

In a bone-chilling ordeal of life-threatening intimidation, Heather Nelson was held at gunpoint by her estranged husband, Larry White, for over three hours. During this time, White forced Nelson to watch a videotape in which White repeatedly threatened Nelson with violence and murder. White did not physically abuse Nelson during the terrorizing event. White appeals his convictions of first-degree burglary and kidnapping. He argues the infliction of mental anguish alone is not sufficient to constitute the "torture" element of first-degree kidnapping. White also contends the district court erred in admitting evidence of a prior assault between him and Nelson. White claims his trial counsel was ineffective for failing to move for a judgment of acquittal based on the lack of evidence to prove White confined Nelson with the specific intent to inflict serious injury and to torture her. Because we find the court properly admitted the prior acts evidence, mental anguish alone is sufficient to constitute "torture" for first-degree kidnapping, and there is substantial evidence in the record to support White's convictions, we affirm.

## I. Background and Facts

Larry White and Heather Nelson separated after nine years of marriage. In September 2001, two days after Nelson moved out, White went to Nelson's home and the two fought.[1] White slammed Nelson's head into the side of the house. Later that day on the telephone, White threatened to get a gun and shoot Nelson.

One month later on October 20, 2001, during the early morning hours, White broke into Nelson's home while she was gone. He brought with him a camcorder, a package of videotapes, a shotgun, and shells. White set up the camera in Nelson's bedroom and videotaped himself for two-and-a-half hours. The State accurately characterized the contents of the tapes as a "repetitive litany of self-pity, obsession, and homicidal ideation directed to-

1. The time surrounding a couple's separation is the point in their relationship when violence is most likely to occur. Patricia Tjaden & Nancy Thoennes, *Extent, Nature and Consequences of Intimate Partner Violence,* National Institute of Justice and the Centers for Disease Control and Prevention (July 2000) *available at* http://www.ncjrs.org/txtfiles1/jij/181867.txt; *see also* Anne L. Ganley, Ph.D., *Domestic Violence Cases in the Civil Court: A National Model for Judicial Education,* 20, The Family Violence Prevention Fund (1992).

In the case before us, not only were Nelson and White separated, but a no-contact order was in place against White. Approximately four in ten domestic abuse perpetrators who are sentenced to jail for violence against a current or former spouse had a no-contact order in place when they committed the crime. United States Department of Justice Bureau of Justice Statistics, *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends* (March 1998) *available at* http://www.ojp.usdoj.gov/bjs/pub/acsii/vi.txt.

ward his wife and her male friends." After Nelson came home around 8:00 a.m., White forced her into the upstairs bedroom. While the video camera was still recording, White threatened to shoot off Nelson's knee. He ordered her into a chair and questioned her about her sexual activities since their separation. Nelson screamed and pleaded for her life. White turned the tape off and forced Nelson downstairs to view the videotapes in their entirety. As Nelson watched, White pointed the gun at her. Nelson admitted their marital problems were her fault and said other things "to make White feel good." Nelson asked White for the videotape and he gave it to her before leaving the house.

White was charged with first-degree kidnapping and first-degree burglary in violation of Iowa Code sections 710.1, 710.2, and 713.3 (2001). The court denied White's motion in limine seeking to exclude evidence of the assault that occurred two days after their separation. A jury convicted White and he appeals.

## II. The Merits

White argues the district court erred in admitting evidence of a prior assault between him and Nelson and in finding sufficient evidence to support a finding that he intentionally inflicted torture and serious injury upon Nelson. White also brings a claim of ineffective assistance of counsel for his attorney's failure to move for a judgment of acquittal based on the lack of evidence to prove White confined Nelson with the specific intent to inflict serious injury.

### A. Prior Bad Acts

■■■■ White argues the trial court erred in admitting evidence of White's assault on the victim one month prior to the crime. He asserts the evidence was more prejudicial than probative. We review rul-

ings on the admission of evidence of prior bad acts for an abuse of discretion. *State v. Brown*, 569 N.W.2d 113, 116 (Iowa 1997).

The circumstances surrounding the prior assault are as follows. Two days after Nelson moved into her own house, White showed up unannounced and uninvited. He called her a "slut" and a "whore." Nelson and White got into a physical struggle on her porch. Nelson slapped White. He held her by her wrists up against the house. He held her wrists so tight Nelson heard one of them "pop." White "gritted his teeth and held his breath and just got red in the face and started to shake in anger." White let go of Nelson's wrists, but then put his hands on her head. He drew Nelson close and then hit her head against the side of the house. Nelson "saw stars" and collapsed. After White left, Nelson called him. White said he had a gun and as soon as he could find some shotgun shells, he was going to come back to Nelson's house and shoot her. While Nelson and White were on the telephone, Nelson heard White rummaging through drawers and objects breaking. When White eventually returned to Nelson's house, he was arrested by the police.

■■■■ The State sought to introduce the evidence of the prior bad act as being relevant to the issue of White's specific intent. The trial court agreed and allowed the evidence in, subject to a limiting instruction. In general, evidence of one crime cannot be used to prove another crime occurred. Evidence which is intended only to show the defendant is a bad person and should therefore be convicted of the charged crime must be excluded. *State v. Delaney*, 526 N.W.2d 170, 175 (Iowa Ct.App.1994). However, if the evidence of crimes, wrongs, or bad acts is relevant to issues other than the defen-

dant's propensity to commit crime, it may be admissible. Iowa R. Evid. 5.404(b). For example, the evidence may be admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* To be admissible, the evidence must be relevant " 'to prove some fact or element in issue other than the defendant's criminal disposition.' ". *State v. Rodriquez,* 636 N.W.2d 234, 239 (Iowa 2001) (quoting *State v. Castaneda,* 621 N.W.2d 435, 440 (Iowa 2001)). The second requirement for admissibility is that the probative value of the evidence must not be substantially outweighed by the prejudicial effect engendered by showing the defendant has committed other crimes. *Id.*

Initially, White claimed a defense of diminished responsibility. At trial, he claimed he suffered from post-traumatic stress disorder from losses in his life that occurred in the early 1990s and that this disorder prevented him from forming specific intent. In the present case, to prove the charge of first-degree kidnapping, the State had to prove White had specific intent to inflict serious injury upon and to torture Nelson. To prove the charge of first-degree burglary, the State had to prove White had specific intent to commit an assault upon breaking into Nelson's house. The State argued the defense of *diminished responsibility put White's* specific intent in direct issue with the evidence of the prior assault being relevant.

To determine the admissibility of the proffered evidence, we first must analyze whether the evidence was relevant to the crime charged. We agree with the trial court's conclusion that the evidence of the prior act was relevant. A fiercely contested issue at trial was White's specific intent as it was necessary for both the charges of burglary and kidnapping. White's prior acts of banging Nelson's head against a wall and threatening to shoot her are undoubtedly relevant to the charges before us. Evidence of White's prior intentional, violent acts toward the victim, aggravated by his prior death threats, makes it more probable White intended to cause Nelson serious injury on the day in question. *See Rodriquez,* 636 N.W.2d at 242 (citing *State v. Haskins,* 573 N.W.2d 39, 45–46 (Iowa Ct.App.1997) (finding evidence of prior assault against victim relevant to intent of defendant charged with attempted murder of victim)). The evidence of the prior bad act is relevant to the instant charge of kidnapping because it tends to negate White's claim of diminished responsibility. That is, the evidence makes it more probable that White's actions were the product of intentional, voluntary decisions to inflict serious injury upon Nelson and to subject her to torture. These were not the actions of a man incapable of forming intent. Rather, White's history shows a pattern of willful, abusive behavior. The concern of more consequence is whether the probative value of the prior act is outweighed by the danger of prejudice.

 Having found the evidence is relevant to the charges before us, we now turn to whether the probative value is outweighed by the prejudicial effect. Evidence is unfairly prejudicial if it,

[a]ppeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause the jury to base its decision on something other than the established propositions in the case.

2 Joseph M. McLaughlin *Weinstein's Federal Evidence* § 403.04[1][c], at 403–40 to 403–44 (2d ed.2001). When weighing the probative value of the evidence against the danger of prejudice, the court must consider

on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other hand, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

*Rodriquez*, 636 N.W.2d at 240 (quoting *State v. Wade*, 467 N.W.2d 283, 284–85 (Iowa 1991)). There must be clear proof the defendant committed the prior bad act. *Id.* (citing *Brown*, 569 N.W.2d at 117).

We must determine whether the trial court abused its discretion in deciding the probative value of the evidence outweighed its inherently prejudicial effect. White contested whether he had specific intent to cause Nelson serious injury or torture her. At trial, he asserted because of depression and post-traumatic stress syndrome, he was unable to form the requisite intent to commit burglary and kidnapping. He claimed his acts must be interpreted in light of his then existing diminished capacity. Evidence of the prior bad acts is extrinsic evidence the jury could consider in determining whether White had formed specific intent in the later incidents of burglary and kidnapping. The evidence is of the nature that it had a tendency to make the existence of White's specific intent on October 20, 2001, more probable than it would be without the evidence of his prior violent acts and verbal threats to kill Nelson. *See Rodriquez*, 636 N.W.2d at 239 (quoting *Brown*, 569 N.W.2d at 116).

As a final matter, there was clear proof White committed the prior acts. He did not dispute them at trial. This fact supports the admission of the evidence. Moreover, in the context of this trial, evidence of White slamming Nelson's head into a wall and threatening to kill her is not likely to arouse the jury's sense of horror. Admittedly, the jury could have been swayed by unfair prejudice from the admission of the evidence. However, the prior acts were not the focus of the trial. Within the scope of the entire trial, the State spent little time developing the prior acts evidence. The prior acts were substantially less brutal than White's acts of October 20. Consequently, the prior acts evidence would not rouse the jury to "overmastering hostility." *Id.* (citing *State v. Larsen*, 512 N.W.2d 803, 808 (Iowa Ct. App.1993)). On balance, we cannot say the trial court did not fairly weigh the relevant factors in deciding whether to admit the prior acts evidence. The court's resolution of this difficult balancing approach was reasonable and did not constitute an abuse of discretion.

## B. Sufficiency of the Evidence

White argues there is insufficient evidence to support his conviction for first-degree kidnapping. Specifically, he contends mental anguish unaccompanied by physical injury or sexual abuse is not "torture" within the meaning of Iowa Code section 710.2. Our review is for correction of errors of law. *State v. Kotlers*, 589 N.W.2d 736, 738 (Iowa 1999).

The Iowa Code provides first degree kidnapping is "when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse." Iowa Code § 710.2.[2] In the present case, there

2. A charge of kidnapping, in general, is when: the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do

is no evidence of serious injury or sexual abuse. Therefore, the State had the burden to prove White intentionally subjected Nelson to "torture" as is contemplated by section 710.2. We have repeatedly addressed cases involving both mental suffering accompanied by either physical injury or sexual abuse. *See, e.g., State v. Siemer,* 454 N.W.2d 857 (Iowa 1990); *State v. Simmons,* 454 N.W.2d 866 (Iowa 1990); *State v. Schertz,* 330 N.W.2d 1 (Iowa 1983); *State v. Schertz,* 328 N.W.2d 320 (Iowa 1982); *State v. Cross,* 308 N.W.2d 25 (Iowa 1981); *State v. Kirchner,* 600 N.W.2d 330 (Iowa Ct.App.1999). However, whether mental torture alone is enough to constitute "torture" as it is used in section 710.2 is an issue of first impression in Iowa.

We had occasion in *State v. Cross* to discuss the definition of torture. We relied upon "[c]ommentators on the criminal code [who] suggest 'torture' ordinarily means 'the intentional infliction of pain (either) *mental or physical.*" 308 N.W.2d at 27 (citing Dunahoo, *The New Iowa Criminal Code: Part II,* 29 Drake L.Rev. 491, 554 n. 570 (1980); J. Yeager and R. Carlson, 4 *Iowa Practice: Criminal Law and Procedure* § 236 (1979)). Torture is defined by the dictionary as "anguish of body or mind." Webster's Collegiate Dictionary 1242 (10th ed.2002).

A survey of case law from other jurisdictions shows "torture" is generally interpreted to encompass physical and/or mental anguish. *See, e.g., Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1346 (N.D.Ga.2002) (the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him ... information or a confession...."); *Hale v. Gibson,* 227 F.3d 1298, 1335 (10th Cir.2000) (for purposes of "heinous, atrocious, or cruel aggravator" to murder, torture includes the infliction of either great physical anguish or extreme mental cruelty); *People v. Hines,* 194 Colo. 284, 572 P.2d 467, 470 (1977) (class one felony kidnapping is whether the victim is inflicted with "bodily injury," which includes "impairment of mental condition"); *In re A.G.,* 325 Ill.App.3d 429, 258 Ill.Dec. 835, 757 N.E.2d 524, 529 (2001) (in context of CINA action, "torture" of children "includes conduct that involves solely the infliction of emotional harm, mental pain and suffering, mental anguish and agony"); *State v. Wisowaty,* 137 N.H. 298, 627 A.2d 572, 578 (1993) (Class A felony kidnapping is where the victim suffers a "serious injury" which includes "psychological injuries and mental anguish"); *State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766, 793 (1995) (element of "torture" which makes murder "especially heinous, atrocious or cruel and therefore a capital offense," is found "where the victim is subjected to serious physical, sexual or psychological abuse before death").

so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:
1. The intent to hold such person for ransom.
2. The intent to use such person as a shield or hostage.
3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.
4. The intent to secretly confine such person.

5. The intent to interfere with the performance of any government function.

Iowa Code § 701.1. Specifically, in the case before us, the State had the burden to prove White kidnapped Nelson with the intent to inflict serious injury upon her. *Id.* § 710.1(3). Then, to prove first-degree kidnapping, the State was required to prove White kidnapped Nelson, and as a consequence of the kidnapping, Nelson was intentionally subjected to torture. *Id.* § 710.2.

■ It would be contrary to legislative intent and common sense to find "torture" must include an element of physical injury. It is reasonable to assume the legislature was aware of the duality of the term "torture" and would have explicitly limited it to physical torture if that was what the legislature had intended the term to mean. *In re A.G.*, 258 Ill.Dec. 835, 757 N.E.2d at 524, 528–29. Furthermore, other Iowa Code sections lend support to the conclusion that "torture" encompasses mental anguish unaccompanied by physical injury. Iowa Code section 702.18 defines "serious injury" to include "[d]isabling mental illness," *or* extensive bodily injury. Iowa Code § 702.18(1)(*a*), (*b*). We conclude "torture" as it is used in Iowa Code section 710.2 includes mental anguish unaccompanied by physical or sexual assault. In other words, "torture" is either physical and/or mental anguish.

There is substantial evidence showing White intentionally tortured Nelson. When she arrived home, Nelson took a shower. As she dried her hair, Nelson saw the bathroom door move and slowly open. She saw the barrel of a shotgun in the mirror. Nelson dropped the hairdryer and turned around. There stood her estranged husband standing at the threshold with a shotgun. White forced Nelson at gunpoint upstairs to her bedroom. She was so consumed with fear that White was going to shoot her, Nelson walked backwards up the stairs. All the while, White pointed the shotgun at Nelson's chest.

At the top of the stairs, Nelson saw the video recorder. She saw the red light was on and knew she was being taped. She saw shotgun shells lined up in a row on the stand near the television. Nelson believed she was going to die. White ordered Nelson to sit on the bed or he would shoot her knee. As he said this, White pointed the gun at Nelson's knee. White then placed a chair in front of the video recorder and ordered Nelson to sit there. Nelson moved to the chair. At all times, White kept the shotgun pointed at her. He interrogated her. He accused her of sexual infidelity. He demanded she tell the truth about having intimate relationships with other men. Nelson answered his questions. She was hysterical; she was trembling uncontrollably, crying and sobbing, wailing and screaming, and begging for her life. Nelson said, "I don't want you to kill me," and White responded, "Then answer my questions." Nelson pleaded to him not to kill her because their children needed her. White responded, "They'll be alright." When Nelson asked White why he was doing this to her he said, "I'll be in jail as soon as I leave if I don't shut you up.... You can't keep your mouth shut."

At some point, White turned off the video recorder and forced Nelson downstairs. This time, Nelson went down the stairs sideways, terrified White would shoot her in the back. White forced Nelson, at gunpoint, into the living room. White put a videotape in the VCR and turned on the television. He forced Nelson to watch the two and a half hours of videotape White recorded as he waited for Nelson to come home. The tape was replete with explicit statements of White's intent to kill Nelson, his accusations against her, and vulgar name-calling. White stayed with Nelson as she viewed the entire two and a half hour video. As Nelson watched the tapes and heard the homicidal ideations of her husband, White repeatedly cocked and uncocked the shotgun. She heard White say on the tape he was going to torture her. She heard White say he was going to shoot her when she returned home. Nelson believed White was going to hurt her. At one point, White allowed Nelson to go into the kitchen for a cigarette and pop. He pointed the gun at Nelson and followed her into

the kitchen with it. Some time after Nelson returned to the living room, White acted like he was going to let Nelson go. He unloaded the shotgun. When the tape was finished, White said to Nelson "You can go. You can go call the police if you want to." Nelson started walking for the door and reached for her cell phone. White jumped up from the recliner and came after Nelson. He grabbed the cell phone out of her hand and blocked the door so Nelson could not leave. He reloaded the shotgun and ordered Nelson back into the living room. Nelson told White everything was her fault and that she deserved what White had done to her. She told him things to boost his ego. White left the house without his shotgun and shotgun shells.

These facts support the jury's conclusion that Nelson was "torture[d]" within the meaning of Iowa Code section 710.2. This case is more than just a threat with a gun. The record shows repeated acts of terror against Nelson. A psychiatrist who examined the videotapes testified White looked and behaved like a "caged animal." The psychiatrist remarked about White's behavior when he was waiting for Nelson to return home. White repeatedly checked the window for headlights. Every time a car approached the house and White saw the headlights, he became visibly nervous. He watched carefully to determine if it was Nelson coming home. The psychiatrist testified White was "upset" and was ready "for what we call fight or flight." [3]

When Nelson came home, White laid in wait for her as she showered. He crept around the upstairs, tiptoeing so as not to be detected. Holding his shotgun, he hid behind a wall. White intentionally held Nelson at gunpoint for three hours. He made her watch the tape containing his repeated threats to hurt her—to murder her. White forced Nelson to listen to every minute of his two and a half hour videotaped diatribe. Nelson heard the following statements:

"I don't want to kill her. I don't know what else to do."

"Don't know if I'm going to shoot her, shoot her and then me, or shoot her and leave."

"I want to scare the f* * * out of her for once.

"The more I think about it, the more I want to kill them."

"She's got the devil in her."

"I'm not going to shoot anyone but her probably."

"Sometimes I want to shoot her in the f* * *ing p* * *y, blow it away from her. She doesn't need it."

"I'm not even sure this gun will shoot. I hope it does. . . . Feel pretty stupid trying to shoot somebody and it doesn't even work."

"I've always wanted to shoot her and now I really feel like it."

White said that he might leave after he killed Nelson to think about killing himself. White said, "I might have some time after someone finds her." He also apologized to his parents and Nelson's parents. He said to them, "I'm sorry I have to do this." White also made threatening statements directly to Nelson. As Nelson listened to the threats, White repeatedly cocked and uncocked his shotgun in front of her.

These were not impulsive or out of control acts. Rather, everything White did and said bespeaks of purposeful behavior.

3. The psychiatrist testified "fight or flight" is "when a person's really stressed to have tight muscles and your eyes get wide and your pulse rate goes up and your blood pressure goes up and you're ready to either fight or take a hike." The psychiatrist testified these were the intense emotions he saw in White as he waited for Nelson to come home.

White used a shotgun to terrorize Nelson. White repeatedly called Nelson demeaning names such as "slut" and "whore." White portrayed himself on the tape as an innocent victim of his wife's deception. He reiterated that he didn't want to kill Nelson, but he didn't have a choice. He said he "can't cure this problem," referring to Nelson's deception. White said he couldn't live "with her screwing other guys." He said, "[Heather] ruined my life. My life has no meaning." White was extremely jealous. He constantly talked about the other men in Nelson's life. He questioned why he wasn't good enough for her. White said Nelson had "rejected" him. White had used physical violence in the past. He used this fact as additional power to control Nelson in a nonphysical manner. Because of White's past use of physical force, there is an implied threat in his verbally abusive statements made to Nelson in person and on videotape.

In sum, in this case, we are confronted with an overwhelming case of domestic violence resulting in kidnapping. Because there is substantial evidence of White terrorizing Nelson, we affirm.

## C. Ineffective Assistance of Counsel

White argues his trial counsel was ineffective for failing to move for a directed verdict on the issue of his specific intent to inflict serious injury upon Nelson. We review claims of ineffective assistance de novo. *State v. Polly,* 657 N.W.2d 462, 465 (Iowa 2003). To prove an ineffective assistance of counsel claim, White must show by a preponderance of the evidence: (1) trial counsel failed to perform an essential duty; and (2) prejudice resulted from counsel's error. *Id.* (citing *State v. Myers,* 653 N.W.2d 574, 577 (Iowa 2002)). Failure to demonstrate either element is fatal to a claim of ineffective assistance. *Id.* We begin our discussion with the presumption

that counsel acted competently. A claim of ineffective assistance is more likely to prevail when counsel lacked diligence as opposed to the exercise of judgment. *Id.* (citing *Ledezma v. State,* 626 N.W.2d 134, 142 (Iowa 2001)).

As stated above, to prove first-degree kidnapping, the State was required to show beyond a reasonable doubt White confined Nelson with the specific intent to inflict serious injury on her. Iowa Code § 710.1(3). "Serious injury," means any of the following:

a. Disabling mental illness.

b. Bodily injury which does any of the following:

(1) Creates a substantial risk of death.

(2) Causes serious permanent disfigurement.

(3) Causes protracted loss or impairment of the function of any bodily member or organ.

*Id.* § 702.18. For the reasons stated below, we conclude White's trial counsel was not ineffective for failing to move for a directed verdict.

There was no likelihood that had counsel moved for a directed verdict, the court would have granted the motion. There was overwhelming evidence of White's specific intent to inflict serious injury upon Nelson. Those comments are discussed in our discussion above regarding the torture element of first-degree kidnapping. White's comments made in front of Nelson also support the conclusion White had specific intent to inflict serious injury upon her. White's comments show he had intent not only to inflict "disabling mental illness" on Nelson, but also his intent to inflict bodily injury which "creates a substantial risk of death," "causes serious permanent disfigurement," and "causes protracted loss or impairment of the function of any bodily member or organ." *See id.*

In addition to the above direct proof of White's intent to inflict serious injury upon Nelson, there is also supporting circumstantial evidence. White broke into Nelson's home armed with a shotgun and ammunition. White waited upstairs in Nelson's bedroom for her to return home. When he heard a door close downstairs, White tiptoed around the upstairs, hid behind a wall, and held onto his shotgun. White was waiting for the moment he could spring on Nelson with the loaded shotgun. All of the circumstances surrounding this event indicate White had specific intent to shoot her. Based upon this evidence, the trial court likely would have denied the motion for a directed verdict. As such, White's trial counsel did not fail in an essential duty. White's claim of ineffective assistance of counsel must fail.

### III. Conclusion

To prove the torture element of first-degree kidnapping, the State was required to prove beyond a reasonable doubt White intentionally subjected Nelson to torture. Mental torture unaccompanied by physical injury or sexual assault is criminalized under Iowa Code section 710.2. There was substantial evidence upon which the jury could have found White guilty of first-degree kidnapping and first-degree burglary. The trial court did not abuse its discretion in admitting the prior acts evidence. Finally, White failed to prove the elements of his ineffective assistance of counsel claim.

**AFFIRMED.**