**IN THE COURT OF APPEALS OF IOWA**

No. 3-1206 / 13-0142
Filed February 5, 2014

**LARRY DEAN WHITE,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Franklin County, Colleen D.
Weiland, Judge.

Larry Dean White appeals the denial of his application for postconviction
relief. **AFFIRMED.**

Dylan J. Thomas, Mason City, for appellant.

Larry Dean White, Mason City, pro se.

Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney
General, and Dan Wiechmann, County Attorney, for appellee State.

Considered by Danilson, C.J., and Vaitheswaran and Potterfield, JJ.

**DANILSON, C.J.**

In 2002, Larry Dean White was convicted of first-degree kidnapping, in violation of Iowa Code sections 710.1 and .2 (2001).[1] White appeals the denial of his second application for postconviction relief, which he filed in January 2012. Because several claims in the application were time-barred, *see* Iowa Code § 822.3 (2011), and because we reject his claim that his sentence constitutes cruel and unusual punishment, we affirm.

### I. Background Facts and Proceedings.

On April 22, 2002, a jury found White guilty of first-degree kidnapping and first-degree burglary. White characterizes the events resulting in his conviction as follows: "On October 20, 2001, Larry White held . . . Nelson, his estranged spouse, at gun point and forced her to watch a video tape he made and engage in conversation with him." This so minimizes his conduct as to be misleading.

As stated by our supreme court, White subjected his estranged wife to a "bone-chilling ordeal of life-threatening intimidation." *See State v. White*, 668 N.W.2d 850, 852 (Iowa 2003). The court described the ordeal as follows:

> There is substantial evidence showing White intentionally tortured Nelson. When she arrived home, Nelson took a shower. As she dried her hair, Nelson saw the bathroom door move and slowly open. She saw the barrel of a shotgun in the mirror. Nelson dropped the hairdryer and turned around. There stood her estranged husband standing at the threshold with a shotgun. White forced Nelson at gunpoint upstairs to her bedroom. She was so consumed with fear that White was going to shoot her, Nelson walked backwards up the stairs. All the while, White pointed the shotgun at Nelson's chest.
> At the top of the stairs, Nelson saw the video recorder. She saw the red light was on and knew she was being taped. She saw

---

[1] He was also convicted of first-degree burglary, but his challenge applies only to the kidnapping conviction.

shotgun shells lined up in a row on the stand near the television. Nelson believed she was going to die. White ordered Nelson to sit on the bed or he would shoot her knee. As he said this, White pointed the gun at Nelson's knee. White then placed a chair in front of the video recorder and ordered Nelson to sit there. Nelson moved to the chair. At all times, White kept the shotgun pointed at her. He interrogated her. He accused her of sexual infidelity. He demanded she tell the truth about having intimate relationships with other men. Nelson answered his questions. She was hysterical; she was trembling uncontrollably, crying and sobbing, wailing and screaming, and begging for her life. Nelson said, "I don't want you to kill me," and White responded, "Then answer my questions." Nelson pleaded to him not to kill her because their children needed her. White responded, "They'll be alright." When Nelson asked White why he was doing this to her he said, "I'll be in jail as soon as I leave if I don't shut you up. . . . You can't keep your mouth shut."

At some point, White turned off the video recorder and forced Nelson downstairs. This time, Nelson went down the stairs sideways, terrified White would shoot her in the back. White forced Nelson, at gunpoint, into the living room. White put a videotape in the VCR and turned on the television. He forced Nelson to watch the two and a half hours of videotape White recorded as he waited for Nelson to come home. The tape was replete with explicit statements of White's intent to kill Nelson, his accusations against her, and vulgar name-calling. White stayed with Nelson as she viewed the entire two and a half hour video. As Nelson watched the tapes and heard the homicidal ideations of her husband, White repeatedly cocked and uncocked the shotgun. She heard White say on the tape he was going to torture her. She heard White say he was going to shoot her when she returned home. Nelson believed White was going to hurt her. At one point, White allowed Nelson to go into the kitchen for a cigarette and pop. He pointed the gun at Nelson and followed her into the kitchen with it. Some time after Nelson returned to the living room, White acted like he was going to let Nelson go. He unloaded the shotgun. When the tape was finished, White said to Nelson, "You can go. You can go call the police if you want to." Nelson started walking for the door and reached for her cell phone. White jumped up from the recliner and came after Nelson. He grabbed the cell phone out of her hand and blocked the door so Nelson could not leave. He reloaded the shotgun and ordered Nelson back into the living room. Nelson told White everything was her fault and that she deserved what White had done to her. . . .

These facts support the jury's conclusion that Nelson was "torture[d]" within the meaning of Iowa Code section 710.2. This case is more than just a threat with a gun. The record shows repeated acts of terror against Nelson.

. . . .

These were not impulsive or out of control acts. Rather, everything White did and said bespeaks of purposeful behavior. White had used physical violence in the past. He used this fact as additional power to control Nelson in a nonphysical manner. Because of White's past use of physical force, there is an implied threat in his verbally abusive statements to Nelson in person and on videotape.

In sum, in this case, we are confronted with an overwhelming case of domestic violence resulting in kidnapping.

*Id.* at 857-59.

On direct appeal, White contended, in part, there was insufficient evidence to sustain the first-degree kidnapping conviction because the infliction of mental anguish alone is not sufficient to constitute the "torture" element of first-degree kidnapping under Iowa Code section 710.2.[2] *Id.* at 852, 855. The Iowa Supreme Court ruled:

We had occasion in *State v. Cross*, [308 N.W.2d 25 (Iowa 1981),] to discuss the definition of torture. We relied upon "[c]ommentators on the criminal code [who] suggest 'torture' ordinarily means 'the intentional infliction of pain (either) *mental or physical*." [*Cross,*] 308 N.W.2d at 27 (citing Dunahoo, *The New Iowa Criminal Code: Part II*, 29 Drake L. Rev. 491, 554 n.570 (1980); J. Yeager and R.

---

[2] Iowa Code section 710.2 provides, "Kidnapping is kidnapping in the first degree when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is subjected to torture or sexual abuse."

Section 710.1 generally defines kidnapping:

A person commits kidnapping when the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

(3) The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

On direct appeal, White also argued his trial counsel was ineffective for failing to move for a judgment of acquittal based on the lack of evidence to prove White confined his estranged wife with the specific intent to inflict serious injury as required under section 710.1(3). *White*, 668 N.W.2d at 859. The supreme court ruled there was "overwhelming evidence of White's specific intent to inflict serious injury upon" his estranged wife. *Id.*

> Carlson, 4 *Iowa Practice: Criminal Law and Procedure* § 236 (1979)). Torture is defined by the dictionary as "anguish of body or mind." Webster's Collegiate Dictionary 1242 (10th ed. 2002).
>
> A survey of case law from other jurisdictions shows "torture" is generally interpreted to encompass physical and/or mental anguish. . . .
>
> It would be contrary to legislative intent and common sense to find "torture" must include an element of physical injury. It is reasonable to assume the legislature was aware of the duality of the term "torture" and would have explicitly limited it to physical torture if that was what the legislature had intended the term to mean. . . . We conclude "torture" as it is used in Iowa Code section 710.2 includes mental anguish unaccompanied by physical or sexual assault. In other words, "torture" is either physical and/or mental anguish.

*Id*. at 856-57 (internal citations omitted). The supreme court affirmed White's first-degree kidnapping conviction. *Id.* at 860. Procedendo issued September 25, 2003.

In this application for postconviction relief, as amended, White asserted that because the question presented in his direct appeal was one of "first impression," the court's interpretation—that mental anguish alone could constitute torture—as applied to him was a violation of the prohibition against ex post facto laws and his "fair warning" and due process rights under the Iowa and United States Constitutions. He also asserted the sentence imposed (life without parole) was cruel and unusual punishment under the United States Constitution. The State urged dismissal of the application, asserting it was time barred. White responded he was challenging an illegal sentence, which can be raised at any time.

The postconviction court dismissed the application without addressing whether the claims were time-barred. Instead, the court rejected White's claims on the merits; first, concluding the kidnapping statute gave fair warning since the

meaning of "mental-only" torture was fairly ascertainable (citing the dictionary definition and prior case law), and second, analyzing and rejecting White's claim that his sentence was cruel and unusual. White now appeals.

**II. Scope and Standard of Review.**

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law. However, when the applicant asserts claims of a constitutional nature, our review is de novo." *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (internal quotation marks and citations omitted).

**III. Discussion.**

Because we can affirm on any ground raised below, *see DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002), we first address the State's claim that White's application is barred by the statute of limitations.

*A. Three-year bar.* Iowa Code section 822.3 (2011) requires postconviction relief applications be filed within three years from the date the conviction is final, unless the application raises a new ground of fact or law previously unavailable to the defendant. If relying on the new law exception, the applicant must not have been able to raise the issue any earlier—a clarification of the law does not qualify for the exception. *See Perez v. State*, 816 N.W.2d 354, 360–61 (Iowa 2012) (concluding that if the United States Supreme Court's holding in *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010), is eligible for retroactive application because it merely clarified existing law, the postconviction applicant "should have raised his claim regarding failure to advise of immigration consequences within the three-year limitations period of section 822.3").

*B. Fair Warning/Due Process/Ex Post Facto challenges.*[3] The basis for each of these arguments is that the supreme court interpreted "torture" for the first time on White's direct appeal and application of that interpretation to White's case violated his rights to fair warning and due process. "The Ex Post Facto Clauses of the United States and Iowa Constitutions 'forbid enactment of laws that impose punishment for an act that was not punishable when committed or that increases the quantum of punishment provided for the crime when it was committed.'" *State v. Oliver*, 588 N.W.2d 412, 415-16 (Iowa 1998). "Ex post facto application of penal laws by judicial process would violate due process of law, requiring fair notice of the forbidden action." *State v. Bean*, 474 N.W.2d 116, 119 (Iowa Ct. App. 1991) (citing *Bouie v. Columbia*, 378 U.S. 347, 355 (1964)), *overruled on other grounds by State v. Hawk*, 616 N.W.2d 527, 530 (Iowa 2000). But the *White* decision itself cites to prior case law and dictionary definitions. Thus, the *White* appeal clarified the law; it did not set out new law. As was the case in *Perez*, White could have raised these claims within the three-year limitations period of section 822.3.

White argues that the term "torture" was ambiguous until the *White* decision. He cites to *Hatter v. Warden, Iowa Men's Reformatory*, 734 F. Supp. 1505, 1522 (N.D. Iowa 1990), in which he argues the court found a physical component was required for Hatter's kidnapping conviction.

---

[3] In the first three issues raised in White's appeal, he asserts his fair warning, due process, and ex post facto constitutional rights were violated by his conviction for first-degree kidnapping where the finding of torture was based upon the victim suffering mental anguish alone. He cites the Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, sections nine, ten, seventeen, twenty-one, and twenty-six of the Iowa Constitution.

*Hatter* is not on point. The federal district court stated the "question to be resolved is whether petitioner's conduct crossed the line between confinement and removal incidental to second degree sexual abuse and the confinement and removal sufficient to meet the requirements of first degree kidnapping as defined by the Iowa legislature and interpreted by the Iowa Supreme Court." *Hatter*, 734 F. Supp. at 1513. Consequently, the kidnapping/torture alternative was not at issue. The only mention of the torture alternative to first-degree kidnapping came in relation to Hatter's second issue, which was his claim that a life-without-parole sentence was cruel and unusual punishment for his conviction of kidnapping accompanied by the commission of sexual abuse and threats of death. *Id.* at 1521-22. The court was discussing the second factor to be considered in determining whether a sentence constitutes cruel and unusual punishment—the relationship of the crime and its punishment to other crimes and their respective punishments within Iowa's criminal law scheme. *See id.* at 1522. In that context, the *Hatter* court noted, "Except for first degree kidnapping accompanied by sexual abuse, all of the other class 'A' felonies require that the victim suffer torture, serious injury, or death." *Id.* The court then observed that though "torture" is not defined by statute, it "is given its ordinary meaning."[4] *Id.* (citing *Cross*, 308 N.W.2d at 26). The *Hatter* court specifically stated, "The victim in this matter did not suffer serious injury as defined in the Iowa Code, or torture, although the potential for serious injury was there." *Id.*

---

[4] The *Hatter* court rejected the cruel-and-unusual-punishment claim. 734 F. Supp. at 1527. The federal district court's rulings were affirmed on appeal. *Hatter v. Iowa Men's Reformatory*, 932 F.2d 701, 702 (8th Cir. 1991).

As the *Hatter* court noted, the term "torture" is given its ordinary meaning. That ordinary meaning was stated in *Cross*, 308 N.W.2d at 27: "the intentional infliction of pain (either) mental or physical."[5] In *White*, 668 N.W.2d at 857, the supreme court confirmed that meaning:

> It would be contrary to legislative intent and common sense to find "torture" must include an element of physical injury. It is reasonable to assume the legislature was aware of the duality of the term "torture" and would have explicitly limited it to physical torture if that was what the legislature had intended the term to mean. Furthermore, other Iowa Code sections lend support to the conclusion that "torture" encompasses mental anguish unaccompanied by physical injury. Iowa Code section 702.18 defines "serious injury" to include "[d]isabling mental illness," *or* extensive bodily injury. Iowa Code § 702.18(1)(a), (b). We conclude "torture" as it is used in Iowa Code section 710.2 includes mental anguish unaccompanied by physical or sexual assault. In other words, "torture" is either physical and/or mental anguish.

In reaching these conclusions, *White* only clarified the existing law. It did not set forth new law with respect to the meaning of torture as inflicting mental anguish alone. Consequently, no fair warning, ex post facto, or due process issue exists. As was found in *Perez*, White could have raised these claims within the three-year limitations period of section 822.3, and they are now barred. *See* 816 N.W.2d at 361.

*C. Illegal sentence may be challenged at any time.* White also characterizes his application for postconviction relief as a challenge to an illegal sentence. A claim of an illegal sentence is not subject to the statute of limitations found in section 822.3. *See Veal v. State*, 779 N.W.2d 63, 65 (Iowa 2010).

In discussing illegal sentences, the Iowa Supreme Court has stated:

---

[5] The *Cross* opinion notes that the trial court "fashioned a more exacting definition of torture." 308 N.W.2d at 27.

> [A] challenge to an illegal sentence includes claims that the court lacked the power to impose the sentence or that the sentence itself is somehow inherently legally flawed, including claims that the sentence is outside the statutory bounds or that the sentence itself is unconstitutional. This conclusion does not mean that any constitutional claim converts a sentence to an illegal sentence. For example, claims under the Fourth, Fifth, and Sixth Amendments ordinarily do not involve the inherent power of the court to impose a particular sentence. Nor does this rule allow litigants to reassert or raise for the first time constitutional challenges to their underlying conviction.

*State v. Bruegger*, 773 N.W.2d 862, 871 (Iowa 2009). An applicant who is not challenging an illegal sentence cannot avoid the restrictions of section 822.3. *Lopez–Penaloza v. State*, 804 N.W.2d 537, 542 (Iowa Ct. App. 2011).

We conclude, under the principles stated in *Bruegger*, White's fair warning, due process, and ex post facto claims do not assert the district court lacked the power to impose the life-without-parole sentence or that the sentence itself is somehow inherently legally flawed; those challenges therefore do not avoid the restrictions of section 822.3.

In *Hill v. United States*, 368 U.S. 424, 430 (1962), the United States Supreme Court noted that challenges to an illegal sentence include whether "[t]he punishment meted out was . . . in excess of that prescribed by the relevant statutes, multiple terms were . . . imposed for the same offense, . . . [or] the terms of the sentence itself [were] legally or constitutionally invalid in any other respect." *Id.* Applying the principle stated in *Hill*, our supreme court concluded that Bruegger's cruel-and-unusual-punishment challenge to his twenty-five-year sentence for statutory rape constituted a challenge to an illegal sentence. *Bruegger*, 773 N.W.2d at 872 ("Where, as here, the claim is that the sentence itself is inherently illegal, whether based on constitution or statute, we believe the

claim may be brought at any time."). The State concedes White's claim that a sentence of life without parole constitutes cruel and unusual punishment is "not subject to the normal rules of error preservation." *See State v. Oliver*, 812 N.W.2d 636, 639 (Iowa 2012).

The postconviction court analyzed and rejected White's claim that his life-without-parole sentence was cruel and unusual. We agree.

"[A] reviewing court has the authority to consider whether imprisonment for a term of years for a particular crime or crimes is so excessive as to violate the Cruel and Unusual Punishment Clause." *Bruegger*, 773 N.W.2d at 872.

> In order to establish a claim for cruel and unusual punishment, a sentence must be "grossly disproportionate" to the underlying crime. *Rummel v. Estelle*, 445 U.S. 263, 271 (1980). As Justice Rehnquist suggested, a life sentence for a parking ticket could run afoul of cruel and unusual punishment as being grossly disproportionate to the crime. *Id.* at 274 n.11. Strict proportionality in sentencing, however, is not required, and a reviewing court is not authorized to generally blue pencil criminal sentences to advance judicial perceptions of fairness. "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991). While a sentence to a term of years might be so lengthy as to violate the Cruel and Unusual Punishment Clause, such an occurrence outside the context of capital punishment has been "exceedingly rare."

*Bruegger*, 773 N.W.2d at 873.

In evaluating whether a lengthy sentence is cruel and unusual punishment, the United State Supreme Court has developed a three-part test sometimes referred to as the *Solem* test. *See Solem v. Helm*, 463 U.S. 277, 291-92 (1983). The "threshold test" involves an evaluation of whether the challenged sentence is "grossly disproportionate" to the underlying crime.

*Bruegger*, 773 N.W.2d at 873. "If, and only if, the threshold test is satisfied, a court then proceeds to steps two and three of the analysis." *Oliver*, 812 N.W.2d at 647. "These steps require the court to engage in an intrajurisdictional analysis 'comparing the challenged sentence to sentences for other crimes within the jurisdiction.'" *Id.* (citation omitted). "Next, the court engages in an interjurisdictional analysis, 'comparing sentences in other jurisdictions for the same or similar crimes.'" *Id.* (citation omitted). But, "[i]f the sentence does not create an inference of gross disproportionality, then 'no further analysis is necessary.'" *Id.* at 650.

> There are some general principles we must consider when reviewing a defendant's sentence to determine whether it is "grossly disproportionate" to the crime committed. The first is that we owe substantial deference to the penalties the legislature has established for various crimes. As noted earlier, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion." *Graham* [*v. Florida*, 130 S. Ct. 2011, 2028 (2010)]; *see also Bruegger*, 773 N.W.2d at 872–73; [*State v.*] *Seering*, 701 N.W.2d [655,] 670 [(2005)]; *State v. Cronkhite*, 613 N.W.2d 664, 669 (Iowa 2000). We give the legislature deference because "[l]egislative judgments are generally regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual." *See Bruegger*, 773 N.W.2d at 873.
>
> The second principle is that it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review. *State v. Musser*, 721 N.W.2d 734, 749 (Iowa 2006) (citing *State v. Lara*, 580 N.W.2d 783, 785 (Iowa 1998)); *see also Cronkhite*, 613 N.W.2d at 669. This is true even though our review is more stringent than is required under the Federal Constitution. *See Bruegger*, 773 N.W.2d at 883.
>
> The third principle is that a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender. *See Solem*, 463 U.S. at 296 [ ] ("[A] State is justified in punishing a recidivist more severely than it punishes a first offender."). . . .
>
> Finally, we note that the unique features of a case can "converge to generate a high risk of potential gross disproportionality." *Bruegger*, 773 N.W.2d at 884. The unique

factors at issue in *Bruegger* were "a broadly framed crime, the permissible use of preteen adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders." *Id.* Thus, we must examine the unique combination of the features in [the defendant's] case as part of our threshold determination regarding the inference of gross disproportionality.

*Oliver*, 812 N.W.2d at 650-51 (footnote omitted).

In *Oliver*, the defendant was convicted for the second time of third-degree sexual abuse. *Id.* at 637. The court considered and rejected his cruel-and-unusual-punishment challenge to the application of a recidivist sentencing enhancement, which resulted in a life-without-parole sentence. *Id.* at 651-54. Considering the specific facts of Oliver's case the court found no inference of gross disproportionality. *Id.* at 652-54.

There are no "unique factors" here to make this an unusual sentence with respect to the conduct for which White was charged. *See id.* at 648 (noting the unique factors of Bruegger's case). As summarized by the State, "with elaborate preparation, White kidnapped Nelson and tortured her for hours, promising to shoot her . . . , to kill her, and to kill her friend. Interrogating her, cocking and uncocking the shotgun, he emphasized that her life depended on her answers or, perhaps worse, on his whim." White was a grown man who deliberately terrorized his estranged spouse at gunpoint for hours. He forced her to watch his videotaped promises to maim and kill her. He argues, "The victim . . . suffered absolutely no physical cruelty." In *Oliver*, the court found mandatory life in prison for a second commission of third-degree sexual abuse resulting in no physical

injury was not grossly disproportionate.[6]  *Id.* at 653.  We come to the same conclusion here.

We conclude White cannot meet the threshold test of gross disproportionality.  In *Lamphere v. State*, 348 N.W.2d 212, 214 (Iowa 1984), the defendant abducted a woman, handcuffed her, and drove to a park where he subjected her to various acts of sexual abuse.  The defendant claimed a life sentence was too severe where no death or serious injury occurs.  *Lamphere*, 348 N.W.2d at 220.  The supreme court disagreed, noting certain acts of felony-murder require a life sentence even though the defendant "need not even have contemplated a killing when commencing a foray into crime."  *Id.*

We defer to the legislative determination that kidnapping combined with torture should result in the most severe penalty recognized in this state.  White's sentence, either in general or as applied, complied with the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution.

**AFFIRMED.**

---

[6] The court stated:

> Oliver has committed multiple crimes as an adult and has an extensive criminal history.  He has shown a lack of remorse and an inability to be rehabilitated.  Based on the facts of his case, life without parole does not strike us as a grossly disproportionate punishment to his crimes.  Since the penalty does not lead to an inference of gross disproportionality, we need not proceed to steps two and three of the analysis, the intrajurisdictional and interjurisdictional comparisons.

*Oliver*, 812 N.W.2d at 653.