# IN THE COURT OF APPEALS OF IOWA

No. 22-0190
Filed March 8, 2023

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**JERIN DOUGLAS MOOTZ,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.

A defendant appeals his conviction for neglect or abandonment of a dependent person. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

A jury found Jerin Mootz guilty of neglecting or abandoning his minor son, J.M., on October 20, 2020.  Over Mootz's objection, the State presented evidence at trial about a 2019 welfare check where J.M. told law enforcement he had been kicked out of his father's home.  Mootz now appeals the district court's admission of this prior bad act evidence, arguing it was propensity evidence and prejudicial to him.  The State contends the evidence showed Mootz's knowledge that his act exposed his child to a known danger and his reckless disregard of that danger and that it was needed to confront Mootz's claim it was all a mistake.  Because we find no abuse of the district court's discretion in allowing the presentation of evidence about the 2019 event, we affirm.

**I. Background Facts and Prior Proceedings.**

On a dreary October afternoon, J.M.—then eleven years old—was found alone outside a Davenport grocery store with two large dogs not wearing leashes or collars.  When a store clerk went outside to check on the child, he explained he had been kicked out of his father's home because his father, Mootz, was angry the dogs were fighting.  The clerk called the police, and Officer Joshua Wehde arrived at the store.  He found J.M. wet from the rain and shivering and believed the child had been out wandering for about forty-five minutes.  The dogs were fighting with one another and one was visibly injured, and J.M. was struggling to keep them apart.  Officer Wehde was informed that law enforcement had been at Mootz's home that morning to do a welfare check; but, when officers spoke with J.M., he said he was not scared and they allowed him to remain in the home.  Because of the new turn of events, Officer Wehde decided he could not return the child to

Mootz's home. An emergency court order placed J.M. in temporary foster care, and a temporary removal hearing was scheduled.[1] The Iowa Department of Human Services child protection worker, Kevin Schmidt, went to Mootz's home a few days later to serve the temporary removal paperwork—Mootz looked at Schmidt through the curtain but would not engage. On October 23, Schmidt left the paperwork and his business card under the doormat. Mootz did not attempt to contact Schmidt between that date and the subsequent removal hearing on October 27.

Mootz was charged with neglect or abandonment of a dependent person, as a habitual offender, in violation of Iowa Code sections 726.3, 902.8, and 902.9 (2020). Specifically, section 726.3 reads in part:

> A person who is the father, mother, or some other person having custody of a child, or of any other person who by reason of mental or physical disability is not able to care for the person's self, who knowingly or recklessly exposes such person to a hazard or danger against which such person cannot reasonably be expected to protect such person's self or who deserts or abandons such person, knowing or having reason to believe that the person will be exposed to such hazard or danger, commits a class "C" felony.

As to this charge, the State was required to prove (1) Mootz was the father of J.M., (2) J.M. was under the age of fourteen, (3) Mootz "knowingly or recklessly exposed [J.M.] to a hazard or danger against which [J.M.] could not reasonably be expected to protect himself" *or* Mootz "deserted or abandoned [J.M.] knowing or having reason to believe that [J.M.] would be exposed to a hazard or danger." So, to address elements of the charge, the State intended to present details about a

---

[1] J.M.'s mother was eventually contacted, but at that point the child could not be placed in her home because she lived across state lines in Illinois.

2019 incident involving similar details to those resulting in the charges. At that time, Deputy Sheriff Jack Asquini responded to a welfare check around eight o'clock at night and found J.M. and his sister standing outside; they reported their father had kicked them out of their home. When Mootz finally answered Deputy Asquini's knock at his door, Mootz told him to "keep the kids." After Deputy Asquini informed Mootz he was neglecting the children, Mootz stepped away from the door and refused any further discussion. To block presentation of this evidence, Mootz moved in limine to prohibit the State from discussing it; the district court determined it would reserve ruling on the motion to see how the evidence developed in the trial. When it came time in the State's case to present the evidence, the district court denied Mootz's motion in limine and allowed the testimony about the 2019 incident.

After the State's case-in-chief, Mootz moved for a judgment of acquittal, arguing the State failed to prove he (1) knowingly or recklessly exposed J.M. to danger or (2) deserted or abandoned him. The district court denied the motion. Mootz went on to testify, explaining that J.M. had a key to the house, he saw J.M. leave the house with the dogs on October 20 but thought he was just out playing with his friends, and it was not unusual for his son to stay out playing for hours at a time. Mootz explained that while J.M. left the house after they had a conversation suggesting J.M. live with his mother, Mootz argued that J.M. must have mistakenly believed he was "kicked out" and had to leave immediately. Then as for his side of the 2019 event, Mootz explained that the children were bothering him when he returned from a sixteen-hour work day, so he sent them outside to play. In his closing, he argued not only that he did not intend to kick J.M. out of the home, but

he did not know that J.M. was in danger. He renewed his motion for judgment of acquittal at the close of his evidence, and it was again denied. The jury found Mootz guilty. He now appeals the district court's decision to admit evidence of the 2019 incident.

## II. Analysis.

We review evidentiary rulings for an abuse of discretion. *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable . . . [or] if it bases its conclusions on an erroneous application of the law." *Id.* (alterations in original) (citation omitted).

Iowa Rule of Evidence 5.404(b)(1) (2020)[2] states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But, it "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of a mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). The rule "seeks to exclude evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question." *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001).

---

[2] As of January 1, 2023, this rule has been updated. Because we are reviewing a trial held in November 2021, before the change took effect, we use the previous version. *See* Iowa Supreme Ct. Supervisory Order, *In re Adopting Amendments to the Iowa Rules of Evidence in Chapter 5 of the Iowa Court Rules* (Sept. 14, 2022), available at https://www.iowacourts.gov/collections/754/files/1623/embedDocument/.

District courts must ensure prior acts evidence passes three hurdles to be admissible at trial. *Thoren*, 970 N.W.2d at 626. First, the evidence must be "relevant to a legitimate, disputed factual issue." *Id.* (citing *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014)). Then, "the evidence must provide 'clear proof' that the defendant engaged in the act." *Id.* (citing *Putman*, 848 N.W.2d at 9). Lastly, the evidence's probative value must not be "substantially outweighed by the danger of unfair prejudice to the defendant." *Id.* (citing *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)); *see also* Iowa R. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

"To satisfy the first element, the party introducing the evidence must 'articulate a tenable noncharacter theory of logical relevance' between that evidence and a legitimate, disputed factual issue." *Thoren*, 970 N.W.2d at 626 (citation omitted). Even if the evidence can fit into one of the acceptable purposes listed in rule 5.404(b)(2), "its use should be limited to the specific purpose to which it is relevant." *Id.* at 627. In this case, the reason articulated by the State for the use of the evidence was to show Mootz's knowledge and absence of mistake in contrast to his testimony that the child was only out playing or had made it to his mother. *See State v. Helmers,* 753 N.W.2d 565, 569-70 (Iowa 2008) (concluding the district court should have allowed evidence of a previous no contact order to prove knowledge of the impact of a course of conduct). Following that same reasoning, the district court found evidence of the 2019 incident relevant to "knowledge, and also the issue of lack of mistake or accident." It is true that "the

elements of a charged offense do not automatically become legitimate, disputed factual issues in a case," and elements that are "merely a formal issue derived from the elements of the offense" rather than controverted issues struggle to support prior acts evidence. *Thoren*, 970 N.W.2d at 629, 630 (citation omitted). But, when the issue is actually disputed, it can provide the leverage necessary for prior acts evidence to clear the first hurdle. In this case, Mootz's knowledge was directly in dispute, as underlined by his motion for judgment of acquittal and closing argument, which both revolved around his knowledge. But we focus on the use of the 2019 event to rebut Mootz's theme over J.M.'s mistaken understanding of their conversation. Mootz argued he did not kick J.M. out of the home, but instead J.M. misunderstood the conversation they were having before he left. "[R]ule 5.404(b)(2)'s reference to mistake or accident is not strictly limited to a mistake or accident by the defendant." *Id.* at 633. And the evidence Mootz challenges can also be relevant to rebut his theory that J.M. was mistaken in thinking he had been kicked out of the home. *See id.* ("In some circumstances mistake can also arise in the context of the victim's mistake when the defendant presents specific evidence to support a theory that the victim was mistaken about what happened . . . . In this context, evidence of the defendant's prior actions is not relevant to a mistake that goes [to] the defendant's intent but is relevant to rebut a specific-defense theory of mistake by the victim."). Here, the judge could consider that the details of the 2019 event were relevant to show J.M. had been thrown out before and so J.M.'s understanding of the more recent conversation was not a mistake. So, we find no abuse of the district court's discretion in finding the

evidence was probative to a legitimate disputed element of the crime and was more than mere character evidence.

As to the second requirement, Mootz argues there was not clear proof supporting Deputy Asquini's explanation of the 2019 incident because Deputy Asquini did not see the interaction between Mootz and the children that led to them being outside. "In assessing whether clear proof of prior misconduct exists, the prior act need not be established beyond a reasonable doubt, and corroboration is unnecessary. . . . Testimony of credible witnesses can satisfy the clear-proof requirement." *Putman*, 848 N.W.2d at 9. "There simply needs to be sufficient proof to prevent the jury from engaging in speculation or drawing inferences based on mere suspicion." *Id.* (citation omitted). Although Deputy Asquini did not see the 2019 conversation between J.M. and Mootz, he could testify about his discussion with Mootz that Mootz was neglecting the children and Mootz's comment to the deputy to "keep the kids." Mootz himself did not dispute that he sent the children out of the home or that the deputy had visited. We find no abuse of discretion in the district court's decision to find Deputy Asquini credible and determine there was clear proof to support the evidence.

Finally, Mootz argues the evidence's probative value was substantially outweighed by the danger of unfair prejudice.[3] All evidence will bring with it some prejudice to the party it is being offered against. *State v. Neiderbach*, 837 N.W.2d

---

[3] Through a cautionary jury instruction, the district court explained the limited purpose for the evidence of Mootz's "other acts": "If you find other acts occurred then and only then may such other acts be considered for the purpose of establishing knowledge or absence of mistake." *See Putman*, 848 N.W.2d at 15 (noting a limiting instruction "is an antidote for the danger of prejudice").

180, 202 (Iowa 2013). "Evidence is unfairly prejudicial if it[] '[a]ppeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause the jury to base its decision on something other than the established propositions in the case.'" *State v. White*, 668 N.W.2d 850, 854 (Iowa 2003) (second alteration in original) (citation omitted). Relevant considerations include:

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Putman*, 848 N.W.2d at 9–10 (citation omitted). "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.'" *Id.* at 9 (citation omitted). And, "[i]f the balance between the evidence's probative value and prejudicial effect is relatively close, the evidence should be admitted." *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020).

In sum, it was not unreasonable for the district court to find the evidence of the 2019 incident was relevant to the legitimate, disputed issue of J.M.'s mistaken understanding over their conversation to leave the home. And there is clear proof the incident in 2019 occurred. Finally, the probative value of this evidence is not substantially outweighed by the danger of prejudice.

After evaluating all three barriers to the admission of the bad acts evidence over the 2019 incident, we find no abuse of the district court's discretion in allowing its presentation to the jury.

**III. Conclusion.**

Finding no abuse of the district court's discretion in admitting evidence of the 2019 welfare check, we affirm.

**AFFIRMED.**