**IN THE COURT OF APPEALS OF IOWA**

No. 14-1524
Filed January 13, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**WALTER RAY NOREM,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dickinson County, Patrick M. Carr,

Judge.

        A defendant appeals his conviction for first-degree kidnapping and

second-degree sexual abuse.  **AFFIRMED.**

        Mark C. Smith, State Appellate Defender, and Joseph A. Fraioli, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Kevin Cmelik and Genevieve

Reinkoester, Assistant Attorneys General, for appellee.

        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Rejecting his intoxication defense, a jury convicted Walter Norem of kidnapping and sexual abusing his wife, Dawn. On appeal, Norem raises four issues. First, he challenges the sufficiency of the evidence for first-degree kidnapping. Second, he contends his attorney did not properly challenge the elements of second-degree sexual abuse in moving for judgment of acquittal. Third, he alleges his attorney should have objected to the jury instruction explaining the extent of confinement and removal necessary to prove kidnapping. Fourth and finally, the defense argues a psychiatrist called by the State in rebuttal impermissibly opined on Norem's ability to form specific intent.

On the sufficiency challenge, we find ample evidence Norem removed his wife from a Milford parking lot, transported her to their rural residence, confined her there, and—as a consequence of that removal and confinement—she was intentionally subjected to sexual abuse and torture. On the ineffective-assistance claims, we find Norem failed to show, but for counsel's omissions, there existed a reasonable probability of a different outcome. On the expert witness issue, we find no prejudice because the challenged opinion on intent was cumulative to another expert's view not contested on appeal. Accordingly, we affirm.

## I.     Background Facts and Proceedings

Dawn and Walter Norem[1] were married and lived in rural Harris, Iowa. Their two adult daughters both had residences about fourteen miles away in Milford. Dawn worked in Milford as a dietary manager at a nursing center. A

---

[1] Because the defendant and victim share a surname, we will refer to Walter as Norem throughout this opinion and will refer to Dawn by her first name.

back injury prevented Norem from working. He also suffered from anxiety. In early November 2012, Norem had been feeling increasingly anxious and was not sleeping well.

To deal with his anxiety, on the morning of November 14, 2012, Norem took his prescribed dose of lorazepam. Norem met his wife at her workplace around 3:30 p.m., and the couple went shopping. Norem took another lorazepam during the afternoon. They returned to pick up Dawn's car and both drove home, arriving around 7:00 p.m. Norem seemed "agitated and growly." Norem recalled taking another lorazepam and a double dose of the muscle relaxant, Flexeril. He testified he "washed" down the pills with a glass of white wine. He believed the combination of alcohol and pills would help him sleep. Norem testified he poured another glass of wine "threw it down and then everything went black." He told the jury he did not "remember anything the rest of the night."

What he purportedly does not remember, Dawn will never forget. Dawn testified Norem grew more agitated and angry as the evening wore on. Norem began calling Dawn vulgar names. He urged Dawn to get his shotgun and shoot him because she had already "killed Superman"—referring to himself. Dawn refused. Norem retrieved the shotgun and ammunition and told Dawn to load the gun. He also dropped a shotgun shell into the pocket of Dawn's work smock. She refused to load the gun and decided to leave their home, hoping Norem would "cool off." Dawn drove to Wal-Mart in Spirit Lake. While walking the aisles, she received numerous telephone calls from Norem. She did not always

answer. When she did answer, he called her names such as "stupid bitch and a whore and things like that." Between 9:00 p.m. and midnight, Dawn received a total of seventy calls from Norem.

Dawn also received a call from their daughter Desire, who said her father was at her trailer looking for Dawn. Dawn told Desire she did not "need to be involved with this." Desire testified her father was distraught but did not appear to be intoxicated, though he said he had been drinking.

As Dawn drove aimlessly, Norem continued to call, telling her to come home. At one point she was "almost home," she had "turned up the gravel" when Norem said over the phone, "I'm going to get the gun." So she turned around and drove back to Milford. Dawn arrived at the apartment complex where her other daughter, Destiny, lived. Dawn sat in the car in the complex's parking lot for a moment to gather herself because she did not want to risk her grandchildren seeing her so upset.

Dawn answered a phone call from Norem, thinking he was at home. They were arguing back and forth when "he came flying in with the Suburban. I could tell he was mad, because he didn't even park the truck right. Threw it in 'park' . . . the door flew open," and he charged over to her car. Norem blocked her in; Dawn tried to start her car to back up, but it stalled. Her window was rolled down a few inches; Norem grabbed it with his hands, shattering the glass.

Norem then reached in the car and pulled Dawn out by her hair. He threw her onto the pavement and punched her. She tried to reach for a cell phone, but Norem smashed it. Norem continued to pummel Dawn, who realized her head

was bleeding. She begged him: "Babe stop, I'm bleeding." But Norem did not stop, saying, "I don't care if you're fucking bleeding." Norem pulled Dawn by her hair back into her car but it would not start. He then "shoved" her into the Suburban and drove toward their home.

Somewhere along Dickinson County Road A34 (also known as 220th Street), Norem parked the Suburban and told down Dawn "if she had enough, she could get out." He rolled down the passenger side window, so she could open the door because the door did not open from the inside. Dawn did not get out. She testified, "I looked around at my surroundings, and I had nowhere to run or nowhere to go to. There were no buildings, no houses. It was just fields." She also was concerned Norem would run over her with the Suburban. After she declined his offer to get out, Norem drove toward their rural home. Dawn testified his driving was "all over the road, because he was more worried about yelling at me and punching me on the way home than even watching the road." Dawn recalled "when we turned onto the gravel, he just floors it, buries it to the wood . . . it seemed like 100 miles an hour by the time we got to the driveway." At the driveway, he slammed on the brakes, hit the mailbox, and "took out the mirror on the side of the truck."

Norem opened the passenger side door and pulled Dawn out by her hair. He punched her a few more times while continuing to yell and call her names. He then shoved her into the house. Inside the living room, she saw the loaded shotgun on floor. While Norem was in the kitchen, Dawn slid the shotgun under the couch. Norem said he was going upstairs to bed and asked, "Are you

coming?" When Dawn did not reply, he came into the living room and yelled, "Get your ass upstairs." He then followed Dawn upstairs.

Still bleeding from her head injuries, Dawn left blood stains on the banister and the walls of the stairway. When they got to the bedroom, Norem undressed. Norem continuously called Dawn vulgar names while hitting her with a closed fist. Norem then began to masturbate. He grabbed her by the hair and forced her to perform oral sex. Dawn recalled Norem "choking" her with his penis, telling her to "take it all and asking, 'Who's the whore?'" When she could not answer, she'd "get another hit." Dawn testified she was having difficulty breathing because of the amount of blood in her nose. Norem then pushed her away and ejaculated on her knee saying "You see this? You're not worth this because you're a stupid whore." Norem then went to the bathroom to clean off the blood.

When he returned to the bedroom, he again hit Dawn. He then took off her clothes, threw her on her stomach, and tried to force her to have anal sex. When he could not get another erection, he flipped her onto her back and shoved his hands into her vagina. He then straddled her chest, using his legs to pin down her arms, and again forced her to perform oral sex while he continued to strike her head. Norem again went to clean himself up and came back to bed, hitting her several more times before finally falling asleep.

Dawn's alarm was set for 4:00 a.m., the normal time she prepared to go to work. When the alarm went off, Norem asked what the noise was, and Dawn told him she had to go to work. Norem told her she was not going anywhere looking how she did. Dawn said she would call someone to cover for her, and he

laid back down. Before falling back to sleep, Norem told Dawn: "I hope you die a slow, miserable death." Dawn waited until she was sure Norem was asleep before grabbing some clothes and leaving. Her Chihuahua, Ruby, followed her out the door. Dawn chose to drive the family's Tahoe, because the headlights did not come on automatically. She waited until she was at the end of the driveway before turning on the lights as to not risk waking Norem up.

En route to Milford, Dawn called a coworker to cover her shift. But the coworker was unable to understand Dawn because she was so upset and agreed to meet Dawn at the nursing home. When Dawn arrived, she was frantic. She did not want to stay because she feared Norem might come after her. Her coworkers were able to keep her there and called the police.

Milford Police Officer Andy Yungbluth was first on the scene. He testified Dawn "had a lot of blood coming from her face. She had been very badly beaten up." The Chihuahua also had Dawn's blood on it. Dawn was sitting in a fetal position and became very tense around Officer Yungbluth. A female officer from Arnolds Park, Stacy Schomaker, also responded to the 911 call. Officer Schomaker was able to interact with Dawn. When Dawn was placed in the ambulance, she asked to have the overhead light turned off because she did not want Norem to follow.

At the hospital, nurse Lynelle Swenson treated Dawn. Swenson described Dawn as "terrified; very, very scared; very apprehensive." Dawn had significant bruising, contusions, and swelling to her face and body. Emergency Room Doctor Nalini Payer examined Dawn, noting the patient had pain in her

back, left hand, and ribs. Dawn also suffered a non-displaced broken nose and a hematoma on her forehead.

As Dawn was being treated, law enforcement officers continued their investigation. Osceola County Deputy Sheriff Matt Julius visited Norem's home at about 5:45 a.m., but no one answered the door. Deputy Julius returned with an arrest warrant around 10:30 a.m. and found Norem's daughter, Destiny, and her fiancé at the home. They had been there for about thirty minutes. Norem turned himself into law enforcement. Norem said he had no memory from the night before, but Destiny's fiancée told him that he had beaten up Dawn. Norem said he was "crushed" when he found out what happened.

On November 26, 2012, the State charged Norem with kidnapping in the first degree, in violation of Iowa Code section 710.2 (2013), and sexual abuse in the first degree, in violation of Iowa Code section 709.2, among other offenses. The State amended the charges several times. Ultimately, Norem faced counts of kidnapping in the first degree and sexual abuse in the second degree. Norem entered a plea of not guilty, and a jury trial commenced on October 29, 2013. On November 1, 2013, the jury found Norem guilty on both counts.

At sentencing, the district court merged the sexual assault into the kidnapping conviction and imposed a sentence of life in prison without the possibility of parole. In December 2014, the Iowa Supreme Court granted Norem's motion for delayed appeal.

## II. Scope and Standards of Review

"On the issue of sufficiency of the evidence, we review claims for correction of errors at law." *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). A jury finding of guilt will only be disturbed if it is not supported by substantial evidence. *Id.* We look at the record as a whole but view it in the light most favorable to the State. *Id.* Substantial evidence is evidence that would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *Id.* We review ineffective-assistance-of-counsel claims de novo. *State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015). We review evidentiary rulings, including decisions regarding the admissibility of expert testimony, for an abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).

## III. Analysis

Norem largely focuses on his conviction for first-degree kidnapping—alleging insufficient evidence, a faulty jury instruction, and improper expert testimony. His only claim regarding the second-degree sexual abuse conviction involves his counsel's failure to challenge the State's proof that during the commission of the sexual abuse Norem used or threatened to use force creating a substantial risk of death or serious injury. *See* Iowa Code § 709.3(1)(a). But because any level of sexual abuse would merge into the kidnapping count, the defense concedes that whether counsel's omission resulted in prejudice "depends on whether the Court agrees that evidence was sufficient to support a finding of kidnapping in the first degree." In light of that contingency, we turn first

to the question whether substantial evidence supported Norem's first-degree kidnapping conviction.

### A. Substantial Evidence of First-Degree Kidnapping

The jury determined the State proved beyond a reasonable doubt the following elements of first-degree kidnapping:

> 1. On or about the 14th or 15th day of November, 2012, the defendant confined Dawn Norem at the parties' residence or removed Dawn Norem from Milford, Iowa, to the parties' residence.
> 2. The defendant did so with the specific intent to:
>> a. inflict serious injury upon Dawn Norem, or
>> b. subject Dawn Norem to sexual abuse.
> 3. The defendant knew he did not have the authority or consent of Dawn Norem to do so.
> 4. As a result of the confinement or removal, Dawn Norem was intentionally subjected to torture or sexual abuse.

The jury also answered a special interrogatory, finding the kidnapping began in Milford.

The marshalling instruction reflected Iowa Code sections 710.1 and 710.2.

Iowa Code section 710.1 defines kidnapping, in relevant part, as follows:

> A person commits kidnapping when the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:
>> . . . .
>> 3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

Iowa Code section 710.2 describes kidnapping in the first degree as follows: "when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse."

Norem argues the evidence presented by the State was insufficient to support the verdict because Dawn was not subjected to sexual abuse as a "consequence" of the confinement and removal. *See* Iowa Code § 710.2. He contends his "intervening act" of stopping the Suburban on the shoulder of County Road A34 and giving Dawn the "opportunity to exit" ended the kidnapping.[2] Norem asserts that after the stop "his demeanor changed markedly" and "he did not physically restrain Dawn within the vehicle at that point." The defense claims the kidnapping ended "when Dawn chose to remain in Norem's truck and accompany him back to their residence."[3] Norem argues after that point any confinement or removal the jury could find was "incidental to the sex act itself."

The State disputes Norem's characterization of the record, pointing to Dawn's testimony that her husband remained combative after she chose not to get out of the Suburban. The State calls Norem's offer to let Dawn out an "empty gesture" that did nothing to interrupt her ongoing confinement and removal.

Viewing the evidence in the light most favorable to the State, we find substantial evidence in the record to show that as a consequence of Norem's acts of confinement or removal, Dawn was intentionally subjected to sexual

---

[2] Norem cites recent unit-of-prosecution cases for support regarding intervening acts. *See, e.g.*, *State v. Ross*, 845 N.W.2d 692, 705 (Iowa 2014); *State v. Velez*, 829 N.W.2d 572, 584 (Iowa 2013).

[3] Norem concedes the confinement and removal up until the point when he pulled over met the statutory definition of kidnapping in the third degree. *See* Iowa Code § 710.4 ("All other kidnappings are kidnapping in the third degree.").

abuse and torture.[4]  A reasonable jury could find the fourteen-mile trip from the parking lot in Milford to the Norems' home in rural Harris was one continuous confinement and removal.  Dawn had been beaten and dragged into the Suburban; she was bleeding, had no phone, and was significantly smaller than her angry husband.  Dawn's lesser-of-two-evils choice did not constitute an end to her involuntary confinement and removal.  Even after the brief stop, Norem recklessly drove the Suburban down the gravel road to their residence.  When they arrived, Norem pulled her out of the vehicle, punched her some more, and shoved her into the house.  Inside the house was the shotgun he had asked Dawn to use earlier in the evening.  After she hid the shotgun, Norem commanded Dawn to go upstairs where he continued to beat her and forced her to perform multiple sex acts.  Based on the totality of the evidence, the jurors were free to reject Norem's argument that his offer to let Dawn go meant the confinement and removal was only incidental to the sexual abuse.

We do not believe the evidence of first-degree kidnapping was insufficient as a matter of law.  *See Robinson*, 859 N.W.2d at 481–82 (asking whether evidence presented "a sufficient basis to allow the jury to regard the case as presenting more than sexual abuse").  The State's evidence allowed the jury to

---

[4] Norem does not present a separate argument concerning the torture alternative.  Our supreme court has defined "torture" in Iowa Code section 710.2 as including either physical injury or mental anguish.  *See State v. White*, 668 N.W.2d 850, 857 (Iowa 2003) (upholding a first-degree kidnapping conviction where White repeatedly called the victim demeaning names and terrorized her by cocking a shotgun in front of her).  The district court instructed the jury that "torture" means "the intentional infliction of severe physical or mental pain."  We believe a reasonable factfinder could determine Norem's assertion of control over Dawn throughout the night, his persistent use of derogatory names, and his relentless physical assaults constituted torture.

regard Norem's conduct as far exceeding sexual abuse. Given the vicious abduction of his wife and his repeated acts of violence, Norem had no basis to think Dawn voluntarily accompanied him to their home. *See State v. Bayles*, 551 N.W.2d 600, 609 (Iowa 1996). The record contained substantial proof that as a result of Norem's confinement and removal, Dawn was intentionally subjected to sexual abuse and torture. We will not disturb the jury's verdict on the first-degree kidnapping count.

## B. Ineffective Assistance of Counsel

Norem alleges his trial attorney was ineffective in two ways. First, he contends counsel failed to adequately move for judgment of acquittal on the second-degree sexual abuse count. Second, he argues counsel failed to object to the jury instruction on confinement and removal.

To succeed on these allegations, Norem must show by a preponderance of the evidence that counsel failed to perform an essential duty and prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Prejudice is the reasonable probability of a different outcome. *Ledezma v. State*, 626 N.W.2d 134, 145 (Iowa 2001). On direct appeal, we may either determine the record is adequate and decide the claims or find the record is inadequate and preserve them for postconviction relief proceedings. *See State v. Neitzel*, 801 N.W.2d 612, 624–25 (Iowa Ct. App. 2011). Here, the record is adequate to decide both claims.

### 1. Second-Degree Sex Abuse

Norem claims his attorney failed to effectively move for judgment of acquittal on the count of sexual abuse in the second degree. At trial, defense counsel mistakenly argued the State did not prove Dawn suffered serious injury, an element necessary to enhance sexual abuse to first degree. Counsel did not raise an argument concerning sexual abuse in the second degree. Sexual abuse is elevated from third to second degree if the State can show that "during the commission of sexual abuse" the defendant used or threatened to use "force creating a substantial risk of death or serious injury." Iowa Code § 709.3(1)(a).

We agree Norem's trial counsel breached an essential duty. But because we found substantial evidence to support his conviction for first-degree kidnapping, Norem concedes he suffered no prejudice from counsel's omission. His brief acknowledges: "Norem's conviction for sexual abuse in the second degree 'merged' with his conviction for kidnapping in the first degree, thereby rendering moot any prejudice resulting from the 'level' of sexual abuse for which Norem was convicted because any level of sexual abuse satisfies the 'sexual abuse' element." Accordingly, Norem gains no relief on this issue.

### 2. Kidnapping Jury Instruction

Norem also challenges his counsel's effectiveness for failing to object to the jury instruction describing the extent of confinement and removal necessary to prove kidnapping. The challenged instruction[5] stated:

---

[5] The instruction tracked Iowa Criminal Jury Instruction 1000.5 (2012), promulgated by a committee of the Iowa State Bar Association.

> [C]onfinement or removal requires more than what is included in the commission of the crime of sexual abuse.
>
> A person is "confined" when her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed.
>
> No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement or removal must have significance apart from the sexual abuse.
>
> In determining whether confinement or removal exists, you may consider whether:
>
> 1. The risk of harm to Dawn Norem was increased.
> 2. The risk of detection was reduced.

Norem contends counsel should have objected because the jury instruction was missing critical "intensifiers" from the case law. Under *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981), the risk of harm to the victim must be *substantially* increased and the risk of detection must be *significantly* reduced as a result of the confinement or removal.

After Norem's case was tried in 2013, our supreme court decided *State v. Robinson*, 859 N.W.2d 464 (Iowa 2015), in which the defendant challenged the same uniform jury instruction. The *Robinson* court dismissed the kidnapping charges for insufficient evidence, viewing the jury instructions as law of the case. One justice wrote separately to opine that the confinement instruction "constituted reversible error." *Id.* at 487 (Wiggins, J., specially concurring). The special concurrence expressed: "Even a cursory review of our case law would have revealed we repeatedly emphasized the risk of harm must be substantial and the lessened detection and ease of escape must be significant." *Id.* at 492. The special concurrence believed that reasonably competent counsel would have considered the claim regarding the confinement instruction to be "worth

raising"—despite the fact that our appellate courts have said we are reluctant to disprove of uniform instructions.[6] *Id.*

Assuming Norem's trial counsel had a duty to object to the confinement instruction without the intensifiers, we cannot find Norem suffered prejudice as a result of counsel's omission. In our de novo review of the record, we find no reasonable probability the jurors would have acquitted Norem of kidnapping if they had been instructed that in determining the existence of confinement or removal, they could consider whether the risk of harm to Dawn was *substantially* increased and whether Norem's risk of detection was *significantly* reduced.

As the State points out on appeal, the distance traveled and remoteness of the location where the defendant takes the victim "weigh heavily" in the determination of whether the confinement and removal is more than incidental to committing the underlying offense. *See, e.g.*, *State v. Newman*, 326 N.W.2d 796, 801–02 (Iowa 1982) (driving victim to road "unoccupied by dwellings" increased the risk of harm to the victim and lessened the risk of detection); *State v. Knupp*, 310 N.W.2d 179, 182–83 (Iowa 1981) (finding substantial increase in risk of harm to victim and significantly lessened risk of detention when defendant pulled the victim into his vehicle, drove away before she could escape, and took her six or seven blocks to a point under a bridge); *State v. Holderness*, 301 N.W.2d 733, 740 (Iowa 1981) (holding "asportation from the city to the country

---

[6] The special concurrence also urged a "reformulation of the ISBA's instruction" to "include the concept that the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated the risk of escape." *Robinson*, 859 N.W.2d at 492. We note the ISBA committee has made that change to Iowa Criminal Jury Instruction 1000.5 (2015).

removed the victim to a more isolated area, thus decreasing the likelihood of any passersby coming upon the scene").

Here, Norem forcibly removed Dawn from her car in a public parking lot in Milford, just outside their daughter's apartment building; broke the cell phone in her possession; and transported her fourteen miles to their rural home in a vehicle with a passenger door that did not open from the inside. While Norem gave Dawn the opportunity to leave the vehicle, he did so in a secluded place with no people around to provide her assistance. When she did not take him up on the offer, the confinement and removal continued with Norem driving recklessly down the gravel road to their home and shoving her inside. This removal significantly reduced the risk of detection as the sex abuse occurred in the couple's rural home. It also substantially increased the risk of harm to Dawn as the home was isolated and Norem had access to a shotgun. Given the strength of the State's evidence of confinement and removal, we find no reasonable probability of a different outcome had counsel objected to the uniform jury instruction.

### C. Expert Testimony

Lastly, Norem argues the district court erred in allowing the State to elicit expert testimony on his capability of forming specific intent to commit kidnapping in the first degree. Norem asserted intoxication as a defense. At trial he testified he had no memory of the events in question because he washed down high dosages of anxiety medication and a muscle relaxant with several glasses of

wine. On rebuttal, the State called two psychiatrists—Dr. James Trahan and Dr. James Dennert—to testify regarding Norem's ability to form specific intent.

Norem's trial counsel objected to the State calling these expert witnesses, arguing their opinions would not rebut Norem's intoxication defense. The court asked the prosecution: "What do you expect to elicit from these psychiatrists?" The prosecutor said the experts would testify that "just because he blacked out, does not negate his intent. His actions did show deliberate, goal-oriented behavior that went on throughout the evening." The court decided to let the expert testimony "unfold."

The State asked both experts whether they had formed an opinion as to whether Norem had the "ability to form an intent" on the night of November 14 and morning of November 15, 2012. Counsel objected on both occasions, asserting the experts were being asked to offer an opinion on "the ultimate question that is involved in this case."

On appeal, Norem challenges only the testimony of Dr. Dennert. The defense alleges the district court abused its discretion in allowing Dennert to opine that Norem was "capable of forming intent" at the time of the crimes. Dennert explained his opinion was based on information that Norem engaged in a number of behaviors that "certainly appeared to be goal-directed. What [Norem] said during those times also suggested that his intent was to do exactly what he did." In his brief, Norem contends Dennert's opinion was "exactly the kind of evidence that 'essentially passes on the guilt or innocence of the defendant'" and should have been excluded under *State v. Myers*, 382 N.W.2d

91, 97 (Iowa 1986) (holding "expert opinions as to the truthfulness of a witness is not admissible pursuant to rule [5.]702").

Under Iowa Rule of Evidence 5.702, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." If admissible under rule 5.702, expert testimony also must survive Iowa Rule of Evidence 5.403. *State v. Buller*, 517 N.W.2d 711, 713 (Iowa 1994). Even if relevant, expert evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403. Under Iowa Rule of Evidence 5.704, opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." But under these rules, "a witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard." *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005).

Norem raises an interesting question concerning the admissibility of expert opinions on the ability of a defendant to form specific intent. He points to authority showing jurisdictions across the country are split on the issue. *See State v. Stewart*, 870 S.W.2d 752, 755 (Ark. 1994) (collecting cases). The Arkansas Supreme Court decided the prosecution's expert testimony on criminal intent had the potential to be misleading and confusing to the jury. *Id.* at 756. Norem argues the admissibility of Dr. Dennert's testimony presents a "substantial issue of first impression in Iowa."[7]

---

[7] Norem asked the supreme court to retain his appeal, but the supreme court transferred the case to us.

Even if our court could embrace Norem's novel argument that an expert may not offer an opinion that a defendant relying on an intoxication defense was capable of forming specific intent, Norem would not be entitled to relief on this record. Any error in admitting Dr. Dennert's opinion was harmless because it was cumulative to the State's earlier rebuttal testimony from Dr. Trahan, which is not challenged on appeal. "To warrant reversal, an error must have prejudiced the defendant." *State v. Wixom*, 599 N.W.2d 481, 484 (Iowa Ct. App. 1999). "When evidence is merely cumulative, it cannot be said to injuriously affect the complaining party's rights." *Id.*

Norem abandoned his objection to Dr. Trahan's testimony on appeal. He argues Dr. Trahan did not opine on his individual capacity to form intent. We disagree. During Dr. Trahan's testimony, this exchange occurred:

> [Question]: Based on your interview with Mr. Norem . . . did you have an opportunity to form an opinion on whether or not Mr. Norem's intoxication affected his ability to form an intent to do the things that he did?
> [The Court after denying a defense objection]: Sir, you may answer the question if you recall it. The question is, do you have such an opinion?
> [Dr. Trahan]: Yes, I do have that opinion.

Dr. Trahan then testified that based on his interview with Norem, "it was very clear that he was behaving in a very goal-directed manner the entire time." The psychiatrist explained that by "goal-directed" he meant "not an accidental type of behavior" and provided an illustration of a drunk person accidentally falling from a step versus a drunk person purposefully jumping from a ledge and landing in a swimming pool below. Dr. Trahan further testified Norem "was doing things that, if he were highly intoxicated, he would not have been able to do." Trahan opined

it was "highly unlikely" that Norem "did not know what he was doing." Dr. Trahan added: "Whether he remembered it or not is a different matter."

The prosecutor asked Dr. Trahan: "If he didn't remember it because he was intoxicated, does that mean he is not responsible?" Dr. Trahan answered: "Absolutely not."

The jury heard from both psychiatrists that Norem engaged in "goal-directed" behavior that signaled his capacity to form criminal intent. Even if we concluded the district court abused its discretion by allowing Dr. Dennert's testimony, the jury still would have heard Dr. Trahan's opinion that Norem's behavior was directed toward a specific goal. Norem cannot show he was prejudiced by the district court's failure to sustain the objection to Dr. Dennert's testimony when "substantially the same evidence is in the record" without objection on appeal. *See State v. Brotherton*, 384 N.W.2d 375, 379 (Iowa 1986).

**AFFIRMED.**