# IN THE COURT OF APPEALS OF IOWA

No. 15-0001
Filed May 25, 2016

**STATE OF IOWA,**
　　　　Plaintiff-Appellant,

**vs.**

**JERRY RAY MATTHEWS,**
　　　　Defendant-Appellee.

_____

　　　　Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.


　　　　Jerry Matthews appeals his conviction and sentence for willful injury causing bodily injury, assault with the intent to commit sexual abuse, and assault while displaying a weapon (domestic abuse), alleging the district court erred in allowing evidence of prior assaults and protective orders. **AFFIRMED.**


　　　　Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

　　　　Thomas J. Miller, Attorney General, and Kevin R. Cmelik and Katherine M. Krickbaum (until withdrawal), Assistant Attorneys General, for appellee.


　　　　Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Jerry Matthews appeals his conviction and sentence for willful injury causing bodily injury, assault with the intent to commit sexual abuse, and assault while displaying a weapon (domestic abuse), alleging the district court erred in allowing evidence of prior assaults and protective orders. We affirm.

## I.     Background Facts and Proceedings

In 2008, Matthews and Natalie Baylark met and became romantically involved. Over the next few years, Matthews and Baylark had two children together and continued an on-again-off-again relationship. In the summer of 2013, Matthew and Baylark ended their relationship. In late December 2013, Baylark allowed Matthews to stay in her apartment with the children for a week.

Around midnight on January 4, 2014, Matthews awoke Baylark in her bedroom and, holding a box cutter, told Baylark he was going to commit suicide. Matthews, who was staggering and slumped against the wall as if intoxicated, said he had taken a number of NyQuil pills. Baylark was able to gain possession of the box cutter and then hid it under her pillow. She followed Matthews to the living room, where he sat down and fell asleep on the couch.

Early the next morning, Baylark woke for work. Baylark worked a twelve-hour shift while Matthews watched the children. When she arrived home around 6 p.m., the apartment was dark and quiet. Baylark first checked on her daughter, who was asleep in her room, and then found Matthews sitting fully clothed on the toilet in the bathroom. Baylark and Matthews discussed their relationship for approximately forty-five minutes. Matthews told Baylark he wanted to be a family

again and, if that were not possible, he was going to kill himself. Matthews then asked Baylark for "one good family night," to which Baylark eventually agreed. They ordered pizza, had a few drinks, and watched cartoons with the children until the children went to bed. Afterward, Matthews and Baylark watched a movie.

Baylark testified that, at some point in the evening, Matthews tried to have sex with her and pulled off her shorts; she resisted, saying she wanted to sleep. Matthews moved to the other side of the couch, and Baylark covered up and went to sleep.

Baylark further testified that, around 3 a.m., she awoke to Matthews lying on her arm and crying. Matthews, who appeared sluggish and upset, repeatedly apologized to Baylark and told her he had taken a bunch of pills. Matthews asked Baylark to make love to him one more time before he died. When Baylark refused, Matthews's demeanor completely changed. He "snapped out of whatever act he was pulling," and his movements became "quick and erratic." Baylark indicated she did not think Matthews had really taken the pills, and Matthews became angry. Matthews said, "[Y]ou think this is a game, you think I'm playing?" Matthews asked Baylark for his box cutter back. When Baylark refused, Matthews went to the kitchen and returned with a six-inch serrated steak knife.

Baylark testified Matthews sat on the couch with the knife, was silent for some time, and then told Baylark she "was going to give him what he wanted." Baylark begged Matthews not to make her do it, but Matthews forced her at knife

point to remove her shirt and bra. Matthews then approached Baylark, who was now wearing only her underwear, and removed his shorts. When Matthews began to remove his shirt, he put down the knife on the couch. Baylark grabbed the knife and ran to her bedroom. Matthews pursued her, grabbed her arm, and either pushed or fell into her, causing Baylark to fall through a glass table in her bedroom. As a result of the fall, Matthews recovered the knife. Baylark crouched on the ground, in the fetal position, when she felt five blows to the back of her head and shoulders. Then Matthews screamed, "[L]ook what you made me do," and left the room. Once sure Matthews was gone, Baylark went to her neighbor's apartment for help.

At trial, Matthews provided a different account of events. Matthews testified the conversation in the bathroom on the evening of January 5, 2014, was about Baylark's late return home—which prevented Matthews from going to work—and Baylark's desire that Matthews stay to help with the kids. Following pizza, drinks, and the children going to bed, Matthews and Baylark watched some television. At one point, Baylark left to go to the bathroom and, upon her return, took off her pants. Matthews had Baylark get some lotion, and he gave her a massage, during which Baylark removed all her clothing. Matthews testified he was performing oral sex on Baylark when she left to use the bathroom. When she returned, Baylark was upset and screamed at Matthews about the missing NyQuil pills. Matthews admitted taking the pills. Baylark indicated she did not believe him, put back on her underwear, looked around the house for the pills, and then returned to the living room from the kitchen with a

knife. She gave Matthews the knife indicating he should go ahead and kill himself if he intended to do so. Matthews testified Baylark then berated him, after which Matthews picked up the knife and threw it in Baylark's direction and berated her. Baylark then picked up the knife and, after being dared by Matthews, stabbed Matthews in the chest twice. Matthews threw Baylark off of him; Baylark then started for the bedroom where their son was sleeping. Matthews feared Baylark would hurt their son, so he followed her, at which point Baylark tripped and fell into the glass table. Matthews then struggled with Baylark for the knife and recovered it. Fearing that Baylark may stab him with the glass on the ground, Matthews stabbed Baylark in the shoulder. Matthews testified Baylark then ran from the room while he proceeded to stab himself twice. He dropped the knife in the kitchen and then went to the bathroom where he had left his phone.

Baylark's neighbor testified she found Baylark at her door in nothing but underwear and covered in blood. Baylark told her neighbor Matthews had tried to rape her. The neighbor then called the police. The responding police officers testified that, when they arrived at Baylark's apartment, they found a conscious but unresponsive Matthews in the bathroom with blood on his shirt from a puncture wound in his chest. The officers also found the knife on the kitchen floor.

Both Matthews and Baylark required medical care. Matthews had four lacerations to the chest. Baylark had several injuries, including three lacerations

to the base of her skull, two lacerations on her neck and shoulder, and blunt trauma to her jaw.

At trial, Matthews admitted stabbing himself twice in the chest. When in the hospital, Matthews called into work and said he was hospitalized with self-inflicted stab wounds. Matthews further admitted that, while sitting on the bathroom floor, he posted to Facebook: "I'm sry [sic] everyone I'm died [sic] I killed her." In the days following the incident, Matthews repeatedly apologized to Baylark, once stating by text message:

> i know u hate me i hate myself i will never ask for ur forgiveness i don't feel i deserve it i need help and i will get it sry will never be enough to curb ur pain but its all i have at the moment i wish u and the kids the best and if u ever decide to forgive yrs on down ill always be ready to accept it.

After being released from the hospital, Matthews was arrested and charged with four counts: (1) attempt to commit murder; (2) willful injury causing serious injury; (3) assault with intent to commit sex abuse; and (4) assault while displaying a dangerous weapon (domestic abuse). At trial, Matthews admitted he stabbed Baylark in the shoulder but argued his actions were justified to protect himself and his son. Following trial in October 2014, Matthews was found guilty of assault with intent to inflict serious injury and willful injury causing bodily injury—lesser-included offenses for the first two counts—and assault with intent to commit sex abuse and assault while displaying a dangerous weapon (domestic abuse). The district court subsequently merged the first count—intent to inflict serious injury—into the willful-injury-causing-bodily-injury count. Matthews appeals.

## II.    Scope and Standard of Review

"We review evidentiary rulings regarding the admission of prior bad acts for abuse of discretion." *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* (quoting *State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012)). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* (quoting *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013)). Even if an abuse of discretion has occurred, "reversal will not be warranted if error was harmless." *State v. Reynolds*, 765 N.W.2d 283, 288 (Iowa 2009).

## III.    Admissibility of Prior Bad Acts

Based on Baylark's deposition testimony, Matthews moved in limine to exclude reference to multiple prior incidents where Matthews had exhibited violence toward Baylark as well as any reference to Baylark seeking a domestic abuse protective order against Matthews.[1] The morning of trial, the district court denied Matthews's motion in limine.

### A. The Prior Bad Acts

The first incident occurred in 2008, shortly after Matthews and Baylark moved into an apartment together. When Baylark made a comment regarding

---

[1] Insofar as Matthews also argues the district court erred in failing to give a limiting instruction relating to the prior bad acts and domestic abuse protective order, this argument was not raised below and is thus not preserved on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

Matthews's son from another relationship, Matthews slapped Baylark across the face.

A few months later, a second incident occurred, where Matthews picked up a glass during an argument and threw it across the room. Baylark was angered by Matthews's lack of care for her property, so she threw his video game controller across the room, smashing it. The parties stood in response and approached each other. Baylark said, "If you're going to hit me, go ahead and do it." Matthews then punched Baylark in the stomach, even though the parties believed at the time Baylark might be pregnant. Matthews yelled that he "wasn't going to go through this again," which Baylark believed meant he did not want to have the child. Matthews testified Baylark threw the controller at his head, he pushed her head, and she fell on the couch. He denied ever punching her.

In the fall of 2009, when Baylark was a few months pregnant, Baylark came home to find Matthews in bed with another woman. Baylark yelled at and slapped Matthews, and Matthews shoved Baylark into the bathroom. Baylark attempted to leave the bathroom, but Matthews shoved her back, causing her to fall into the shower. In an attempt to break her fall, Baylark grabbed the towel rack rod and pulled it off the wall. She swung the rod at Matthews, but he caught it and yanked it away. After the woman left, Baylark continued to yell at Matthews. Matthews came at Baylark—prompting Baylark to curl up in a ball—and punched Baylark repeatedly in her backside. Matthews's version of events varied from Baylark's. Matthews indicated Baylark slapped him multiple times; he then grabbed Baylark and walked her into the bathroom where Baylark

repeatedly slapped him; the parties struggled and she fell back, causing her to grab the towel rod; Baylark then swung the rod at him. Matthews testified he never hit Baylark but simply left the house.

The next incident occurred after the birth of their daughter. Matthews left the house without telling Baylark where he was going. Baylark locked the door, requiring Matthews to knock when he returned. This angered Matthews, and he slapped Baylark after entering the home. Also around this time, in a fifth incident, Matthews and Baylark were arguing, and Matthews began choking Baylark. Matthews admitted the argument occurred but stated Baylark had slapped him and he had slapped Baylark back.

Baylark also testified that in 2011 she obtained a domestic abuse restraining order against Matthews. Baylark indicated she sought the restraining order because Matthews had kicked her out of the apartment and she was trying to get her daughter back. Baylark also testified she sought and obtained a second domestic abuse restraining order. At trial, Matthews admitted Baylark had obtained multiple restraining orders against him.

The final incident occurred in 2013. Baylark was driving a car, with Matthews and their two children as passengers. Baylark testified that, as she was driving, she and Matthews were arguing, and he threatened to take the children. Matthews then poked Baylark in the face, and she slapped Matthews in response. Baylark called the police. Matthews testified Baylark had been driving erratically and he poked her in the face by accident. Baylark dropped him at the house, and Matthews removed their son from the car. When Matthews returned

to get their daughter, Baylark sped off. Matthews called the police, but they had already heard from Baylark. Matthews was arrested and pled guilty to disorderly conduct. The court entered a no-contact order.

### B. Applicable Law

The State argued and the district court found the above incidents admissible to prove intent, specifically in light of Matthews's claims of justification. On appeal, Matthews contends the evidence was irrelevant and impermissibly offered to portray him as a bad and violent person.

Iowa Rule of Evidence 5.404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"The rule 'excludes evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question.'" *Putman*, 848 N.W.2d at 8 (alteration omitted) (quoting *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001)); *see also State v. Sullivan*, 679 N.W.2d 19, 23 (Iowa 2004) ("[A] defendant must be tried for what he did, not for who he is." (citation omitted)).

For evidence of prior bad acts to be admissible, the State "must articulate a noncharacter theory of relevance." *See State v. Elliott*, 806 N.W.2d 660, 675 (Iowa 2011). The court then determines whether to admit the evidence by engaging in a three-step analysis. *See Putman*, 848 N.W.2d at 8 (stating the three-step process); *see also Elliott*, 806 N.W.2d at 675 (noting that after a

noncharacter theory is proffered, the court considers relevancy and the danger of unfair prejudice).

First, a court considers whether the evidence is relevant. *Putman*, 848 N.W.2d at 9*; see also State v. Richards*, __ N.W.2d __, __, 2016 WL 2609526, at *4 (Iowa 2016) (stating "the evidence must be relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts" (citation omitted)). Then, a court must conclude if there is clear proof the acts were actually committed. *Putnam*, 848 N.W.2d at 9. Finally, "the court must determine whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Id.* (quoting *Sullivan*, 679 N.W.2d at 25). We consider each element in turn.

### C. Relevance

"Relevant evidence is evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Taylor*, 689 N.W.2d 116, 123 (Iowa 2004) (quoting Iowa R. Evid. 5.401). "The general test of relevancy is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.'" *Putman*, 848 N.W.2d at 9 (alterations in original) (quoting *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988)).

Matthews concedes intent was at issue at trial but claims the prior acts were irrelevant because they occurred years before the incident in question and

because the circumstances of the prior bad acts lack similarity to the incident that gave rise to the charges at issue.

There is no question intent was at issue in this case. See *generally Taylor*, 689 N.W.2d at 124 (considering first whether intent was even at issue). The State was tasked with proving, among other things, that Matthews had "the intent to cause the death of another person and not under circumstances which would justify the person's actions," Iowa Code § 707.11 (2013) (defining attempt to commit murder); acted in a manner not justified with the "inten[t] to cause serious injury to another," *id.* § 708.4 (defining willful injury); and engaged in an act "intended to cause pain or injury" or "intended to result in physical contact which will be insulting or offensive to another," *id.* § 708.1(1).[2] It was the State's burden to show Matthews's actions were not justified. *See State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006) ("Because [the defendant] raised justification as a defense, the State was required to prove [the defendant] acted without justification."). Matthews's self-defense claim does not remove the intent element from contention. *Richards*, 2016 WL 2609526, at *10 ("Intent remains a legitimate matter of dispute even when the defendant asserts self-defense—at least to the extent the State claims the defendant did not believe he was in imminent danger of death or injury and that the use of force was not necessary to protect him.").

The Iowa Supreme Court has recently reiterated the relevance of intent in situations of violence between persons in relationships, stating,

---

[2] Both the third and fourth counts—assault with intent to commit sexual abuse and assault while displaying a dangerous weapon (domestic abuse)—require the State to prove assault as defined in section 708.1. *See* Iowa Code §§ 708.2A(2)(c), 709.11(3).

> [T]here is a logical connection between a defendant's intent at the time of a crime, when the crime involves a person to whom [the defendant] has an emotional attachment, and how the defendant has reacted to disappointment or anger directed at that person in the past, including acts of violence, rage, and physical control. In other words, the defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations.

*Id.* at *5 (alteration in original) *(*quoting *Taylor*, 689 N.W.2d at 125). The court in *Taylor* noted the use of prior-bad-acts evidence is particularly legitimate where the evidence admitted pertains to "defendant's prior assaults of a victim in a prosecution of the defendant for the subsequent murder of the victim." 689 N.W.2d at 125.

Here, Matthews was charged with the attempted murder of Baylark, and the evidence admitted was specific to Matthews's treatment of Baylark throughout their relationship. *See Reynolds*, 765 N.W.2d at 290-91 ("In sexual assault and domestic violence cases, we have recognized that the prior relationship between the defendant and the victim is relevant in establishing intent and/or motive."); *see also State v. Edwards*, No. 12-0688, 2013 WL 4504922, at *3-4 (Iowa Ct. App. Aug. 21, 2013). These incidents are relevant to determining Matthews's intent on the day in issue. *See State v. White*, 668 N.W.2d 850, 854 (Iowa 2003) ("A fiercely contested issue at trial was [the defendant's] specific intent as it was necessary for both the charges [levied]. [The defendant's] prior acts of [violence and threats] are undoubtedly relevant to the charges before us.").

Moreover, Matthews's account of events differed markedly from Baylark's rendition. "Evidence reflecting the nature of the relationship between the defendant and the victim would be crucial to a fact finder resolving the inconsistencies in the witnesses' testimony." *Taylor*, 689 N.W.2d at 127; *see also Richards*, 2016 WL 2609526, at *5 (same). Here, Matthews's prior acts of violence toward Baylark, though illustrative of his propensity to use violence, reflect his emotional relationship with Baylark and are relevant to his intent. *Taylor*, 689 N.W.2d at 128 ("In adult abuse cases, a defendant's history of threatening or violent conduct involving the same victim can be especially probative." (citation omitted)).

Matthews argues the incidents are irrelevant because they were too remote in occurrence from the current event. While "a prior act may be so remote that it is irrelevant," *Reynolds*, 765 N.W.2d at 294, the length of time generally "affects the weight of the evidence rather than the admissibility," *State v. Zeliadt*, 541 N.W.2d 558, 561 (Iowa Ct. App. 1995). *See also State v. Casady*, 491 N.W.2d 782, 785 (Iowa 1992) ("The remoteness of evidence generally affects the weight rather than admissibility of the remote evidence."). Here, though the bad acts predate the January 2014 events by one to five years, they are not so remote "as to negate all rational or logical connection between the fact sought to be proved and the remote evidence offered to prove that fact." *See Casady*, 491 N.W.2d at 785 (finding the elapse of fifteen years and twelve

years—where the individual was incarcerated—was not too remote, and fifteen months after release was not too remote).[3]

Matthews also argues the prior incidents were too factually dissimilar to be relevant to the present circumstance. But each of these circumstances goes to "the nature of the defendant's relationship and feelings toward [this] *specific* individual." *State v. Reyes*, 744 N.W.2d 95, 103 (Iowa 2008). "Domestic violence is never a single isolated incident. Rather, domestic violence is a pattern of behavior, with each episode connected to the others." *Taylor*, 689 N.W.2d at 128 n.6 (citation omitted). "Thus, 'evidence of prior bad acts is especially relevant and probative in domestic violence cases because of the cyclical nature of domestic violence.'" *Id.* (alteration and citation omitted). We conclude the district court did not err in finding the prior-bad-acts evidence relevant.

### D. Clear Proof

Matthews argues there was not clear proof the prior bad acts were actually committed, as the district court simply had his word against Baylark's and the record reflected she had credibility issues. Specifically, Matthews contends there was insufficient proof as Matthews disputes Baylark's version of events, her testimony is mere allegations unsubstantiated by any third-party witness, there is no conviction to support Baylark's version of events, and Baylark's testimony suffers due to her credibility issues. The State counters the district court reviewed Baylark's deposition testimony prior to its ruling on the

---

[3] Matthews relies upon the Iowa Supreme Court's ruling in *Reynolds*, but in that case, the court found the prior bad acts were relevant but excluded them as prejudicial. 765 N.W.2d at 290-91. It thus does not provide support to Matthews's position.

motion in limine and had observed Baylark testify as to the parties' background before it ruled on Matthews's objection at trial. The State concludes this evidence, found credible, was sufficient to support the district court's ruling.

Clear proof does not necessitate that the bad acts be established beyond a reasonable doubt nor is corroboration required. *Putman*, 848 N.W.2d at 9. While Matthews makes much ado about the lack of third-party testimony, conviction, or admission by Matthews to confirm Baylark's version of events, there is simply no requirement that any such evidence be proffered. *See State v. Jones*, 464 N.W.2d 241, 242 (Iowa 1990) ("Adding a corroboration requirement to our clear proof rules is not necessary to accomplish the purpose behind the rule when a victim's testimony, standing alone, satisfies the requirement of clear proof."); *see also Richards*, 2016 WL 2609526, at *11 (noting the victim's "testimony constituted clear proof of the other alleged acts under the circumstances presented"); *State v. Caples*, 857 N.W.2d 641, 647 (Iowa Ct. App. 2014) ("Testimony of a credible witness can satisfy th[e clear proof] requirement."). "There simply needs to be sufficient proof to 'prevent the jury from engaging in speculation or drawing inferences based on mere suspicion.'" *Putman*, 848 N.W.2d at 9 (citations omitted).

Matthews's remaining argument is that Baylark's testimony was not credible. Here, the district court indicated it had reviewed Baylark's deposition testimony and, having cited the clear proof burden, found the prior-bad-acts evidence was admissible and denied Matthews's motion in limine. At trial, after hearing Baylark testify about the history of the parties' relationship, the district

court denied Matthews's objection to the admission of prior bad acts "for the reasons given in the pretrial ruling." Baylark's testimony was sufficiently credible and detailed and did not leave the jury to speculate about the prior acts based on mere suspicion. *See generally Zeliadt*, 541 N.W.2d at 561 (finding clear proof based on testimony of a single witness).[4] Moreover, Matthews admitted there were multiple domestic abuse restraining orders entered against him, which provides support for Baylark's statements. We conclude the court did not abuse its discretion in finding the clear proof standard for admissibility of the evidence was met. The jury remained at liberty to consider the weight, if any, to be attributed to Baylark's testimony about the current and prior allegations.

### E. Probative Value and Unfair Prejudice

In determining whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice, the district court considers a series of factors, including

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Putman*, 848 N.W.2d at 9-10 (quoting *Taylor*, 689 N.W.2d at 124). Because this weighing process "is not an exact science," the district court that made the

---

[4] Matthews relies upon *State v. Adcock*, No. 01-1637, 2002 WL 31528139 (Iowa Ct. App. Nov. 15, 2002), to support his claim that Baylark's testimony is not credible. In *Adcock*, the court noted the lone testifying witness admitted "she was constantly under the influence of drugs, her testimony indicated a noticeable difficulty in recounting past events with certainty, and she had previously signed an affidavit stating defendant had *not* hurt her in the past." *Id.* at *5. The circumstances in *Adcock* are clearly distinguishable from those addressed by the district court here.

judgment call is given a great deal of leeway. *Id.* (quoting *State v. Newell*, 710 N.W.2d 6, 20-21 (Iowa 2006)).

Matthews states, in conclusory fashion, that there was little need for the evidence. But the evidence was admitted to prove intent, which was particularly at issue as a result of Matthews asserting justification as a defense. *See Taylor*, 689 N.W.2d at 129 (noting, when finding prejudice did not substantially outweigh the probative value, "the defendant's intent was 'hotly contested'"). Moreover, the parties' respective versions of events on the night at issue widely differed, creating "a need for evidence that would clarify the circumstances of the defendant's conduct and thereby shed light on his intent." *Id.* "[I]ntent is seldom proved by direct evidence," and therefore, circumstances surrounding the incidents giving rise to the charges at issue are particularly important. *Id.*; *see also Newell*, 710 N.W.2d at 22 (finding prejudice did not substantially outweigh the probative value of the evidence of the defendant's prior bad acts, noting "the abusive and controlling nature of the relationship between [the defendant] and [the victim] was strong evidence of [the defendant's] emotional and mental state at the time of [the victim's] death").

As to the clear proof factor, Matthews reiterates his previous arguments. As noted by the State, however, Matthews generally did not deny the various incidents occurred; he simply provided a different version of events. Further, Matthews admitted a number of restraining orders had been entered against him. This, coupled with Baylark's testimony, which the district court clearly found credible, supports the clear proof standard.

Matthews next argues the evidence was weak as to the relevant issue, noting most of the events were removed in time and factually different from the incident giving rise to the charges. While the events relayed by Baylark varied in the form of violence—punching and slapping versus stabbing—they are all indicative of Matthews's treatment of Baylark and response to Baylark in situations of conflict. Having already determined the evidence was relevant, his argument as to the strength of the evidence was for the jury to weigh.

Finally, Matthews avers the presentation of these prior bad acts created a substantial danger the jury would assume Matthews committed the present assault because of the past assaults, thereby prompting the jury to decide the case on an improper basis. As noted by the court in *Taylor*, "a fact finder, whether judge or jury, would have a tendency to conclude from the defendant's past misconduct that he has a bad character." 689 N.W.2d at 130. "[T]hat type of prejudice is inherent in prior-bad-acts evidence" and thus "will not substantially outweigh the value of highly probative evidence." *Id.* Instead, "[t]he more pertinent question is whether the evidence will prompt the fact finder to make a decision based on an emotional response to the defendant." *Id.*

Here, the allegations were that Matthews repeatedly stabbed Baylark in the head, neck, and shoulder; the prior-bad-acts evidence was that he had, in the past, slapped and punched Baylark. *See White*, 668 N.W.2d at 855 ("The prior acts were substantially less brutal than [the defendant's] acts [on the day in question]."); *State v. Larsen*, 512 N.W.2d 803, 808 (Iowa Ct. App. 1993) (noting the potential prejudice of the uncharged crime was "neutralized by the equally

reprehensible nature of the charged crime"). Under the facts of this case, the prior-acts evidence was substantially less heinous than the allegations of the crimes that were prosecuted and was not likely to "rouse the jury to 'overmastering hostility.'" *White*, 668 N.W.2d at 855 (citation omitted); *Rodriquez*, 636 N.W.2d at 243 ("The prior assaults to which [the survivor] testified were no more brutal than the [present] assault admitted by the defendant. Therefore, this is not a case where *the prior acts evidence* would rouse the jury to 'overmastering hostility.'").

Further, the jury only found Matthews guilty of lesser-included offenses for two of the charged counts, indicating "the bad-acts evidence did not motivate the fact finder to categorically rule against the defendant." *Taylor*, 689 N.W.2d at 130; *see also Edwards*, 2013 WL 4504922, at *4 ("The prejudice to [the defendant] from the admission of this [prior-bad-acts] evidence is undermined by the jury's verdict, which acquitted [the defendant] on [one count] and found him guilty of the lesser included offense on [another count]."). Matthews was able to cross-examine Baylark—and therefore challenge the veracity of her testimony— and testified himself, thereby providing his own version of events. *See Edwards*, 2013 WL 4504922, at *4.

Ultimately, Matthews "was not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship and their parting were peaceful and friendly." *See Taylor*, 689 N.W.2d at 130 (citations omitted); *see also Newell*, 710 N.W.2d at 23 (noting prior-act evidence was admissible to aid the jury in its essential truth-seeking function). Our review

of the record convinces us the district court did not abuse its discretion in admitting the prior-bad-acts evidence for the purposes of proving intent. Accordingly, we affirm Matthews's conviction and sentence.

**AFFIRMED.**